**In re AMERICAN HONDA MOTOR CO.,
INC. DEALERSHIPS RELATIONS
LITIGATION.**

**No. MDL 95–1069.**

United States District Court,
D. Maryland.

March 11, 1997.

See also, 941 F.Supp. 528.

James Ulwick, Kramon & Graham, Baltimore, MD, Richard McNarmara, Wiggin & Nourie, Manchester, NH, Lawrence Silver, Fred Galante, Mark Fields, Lawrence, Silver & Associates, Long Beach, CA, William A. Kershaw, Thomas H. Keeling, Kronick, Moskovitz, Tiedemann & Girard, Sacramento, CA, Mark P. Rapazzini, M. Elizabeth Graham, Rapazzini & Graham, San Francisco, CA, Harvey G. Sanders, Jr., Natalma M. McKnew, James T. Hewitt, Leatherwood, Walker, Todd & Mann, Greenville, SC, Thomas F. Schrag, James S. Baum, Deborah Kemp, Schrag & Baum, Berkeley, CA, for Plaintiff.

Jeremiah T. O'Sullivan, Sarah Chapin Columbia, Raymond A. O'Brien, Choate, Hall & Stewart, Boston, MA, Ty Cobb, Douglas R.S. Nazarian, Hogan & Hartson, Baltimore, MD, Norman C. Hile, Andrew W. Stroud, Orrick, Herrington & Sutcliffe, Sacramento, CA, Gerard P. Martin, Gregg L. Bernstein, Martin, Junghans, Snyder & Bernstein, Baltimore, MD, Richard A. Cirillo, Rogers & Wells, New York City, for Defendant.

## OPINION

MOTZ, Chief Judge.

This multidistrict litigation arises from allegations that during the 1980s and early 1990s certain high-level executives of American Honda received kickbacks and other payments from various Honda dealers in the form of cash and secret ownership interests in Honda dealerships in return for various favors, primarily increased allocation of automobiles or the award of new dealerships. The defendants are American Honda Motor Co., Inc. ("American Honda"); Honda Motor

Co., Ltd. ("Honda Motor"), American Honda's Japanese parent; Honda North America; Honda dealers who are alleged to have paid kickbacks; and Lyon & Lyon, a law firm which allegedly participated in managing the concealment of the illegal scheme, and Roland Smoot, a partner in Lyon & Lyon (collectively "Lyon & Lyon"). The plaintiffs are dealers who did not pay kickbacks.

Following in the wake of the successful criminal prosecution of five former American Honda executives (which itself stemmed from a civil action filed by a Honda dealer in the United States District Court for the District of New Hampshire), numerous civil actions have been filed around the country. The federal actions were transferred to the District of Maryland by order of the panel on multidistrict litigation in August, 1995. Discovery has been proceeding simultaneously with the briefing of motions to dismiss.

On August 30, 1996, I issued an opinion in which for the most part I denied motions to dismiss filed by defendants. *In re American Honda Motor Co. Dealerships Relations Litigation,* 941 F.Supp. 528 (D.Md.1996) (*Honda I*). However, I ruled that plaintiffs' allegations against Honda Motor and Lyon & Lyon were deficient in some respects. I granted plaintiffs leave to amend their complaints against those defendants, indicating that if the pleading deficiencies I identified were cured, I would permit plaintiffs to proceed with their claims. Plaintiffs have filed amended complaints, and Honda Motor and Lyon & Lyon have renewed their motions to dismiss.

The motions to dismiss will be granted in part and denied in part. Plaintiffs' claims against both Honda Motor and Lyon & Lyon under the Robinson–Patman Act are dismissed for the simple reason that neither Honda Motor nor Lyon & Lyon was a party or an intermediary for a party to the relevant transactions as required by § 2(c) of the Act. 15 U.S.C. § 13(c). As to plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), Honda Motor's motion is granted as to the claims asserted under 18 U.S.C. §§ 1962(a) and (b) but is denied as to the claims asserted under §§ 1962(c) and (d). Lyon & Lyon's motion is denied as to the claims asserted under §§ 1962(c) and (d), the only RICO claims asserted against it.

Sections I, II and III of this opinion discuss the RICO claims against Honda Motor; Sections IV and V discuss the RICO claims against Lyon & Lyon; and Section VI states the reasons I am granting a motion filed by Honda Motor pursuant to 28 U.S.C. § 1292(b) for certification of an interlocutory appeal.

## I.

### A.

At the times relevant to this case Honda Motor was (as it continues to be) the corporate parent of American Honda. All of the officers and directors of American Honda were appointed by Honda Motor, and decisions concerning the compensation to be paid to the top managers of American Honda were made by Honda Motor. Four of the eight members of American Honda's board of directors, including its president, were also members of Honda Motor's board. Each of the shared directors received approximately 70 percent of his salary from American Honda and 30 percent from Honda Motor. All of the shared directors were Japanese nationals, and the salary and certain other benefits that they received from Honda Motor were paid to them or their families in Japan. Each of them also received year-end bonuses and pension contributions paid partially by Honda Motor, based upon Honda Motor's performance.

Honda Motor and American Honda have two different functions. Honda Motor manufactures motor vehicles; American Honda distributes them in the United States. Nevertheless, Honda Motor rotated its executives to the United States to serve as officers and directors of American Honda on a regular basis. In addition, other Honda Motor executives and employees came to the United States frequently to oversee the operations of American Honda's regional offices. They visited Honda dealerships to collect information and reported what they learned to Honda Motor.

During the period the alleged wrongful activities occurred, the persons who served simultaneously as directors of Honda Motor and directors and executives of American Honda were Koichi Amemiya, Tetsuo Chino, Takeo Okusa, Yoshihide Munekuni and Michiaki Shinkai. Amemiya, Chino and Munekuni each served at one time as American Honda's president; Munekuni became the chairman of American Honda in 1989; Okusa was the executive vice-president of American Honda from 1989 to 1992; Shinkai was American Honda's vice-president of administration from at least 1983 through 1989. Chino, Munekuni and Okusa have also served as directors of Honda North America, another Honda entity. Munekuni has been its chairman since 1989.

According to plaintiffs' allegations, the kickback scheme was of substantial economic benefit both to American Honda and to Honda Motor. Because American Honda executives were receiving kickbacks, American Honda was able to pay them substantially less compensation than their counterparts with other companies in the industry. This savings in executive compensation was in turn passed on to Honda Motor which, as the sole stockholder of American Honda, received all of its net profits.

### B.

Plaintiffs assert that Amemiya, Chino, Munekuni, Okusa and Shinkai were fully aware of the illegal activities in which American Honda executives and various Honda dealers engaged. Plaintiffs make numerous specific allegations in that regard, including the following:

♦ In the early 1980s J.D. Power, an auto market researcher hired by American Honda, heard reports that American Honda executives were taking kickbacks from dealers in return for favored treatment in the allocation of cars. He passed these reports on to Munekuni by a letter dated March 14, 1983. After receiving the letter, Munekuni did not cause any serious investigation to be conducted.

♦ In 1984 Power met with Munekuni and others, warning them about reports of bribery and kickbacks within the Honda sales organization. Jack Billmyer, a senior vice president of American Honda, was questioned by Japanese management about the allegations. Billmyer told his interrogators that if they did not like the way he was running the business they could hire someone else. Billmyer was retained in his position and no action was taken against him.

♦ In late 1984 or early 1985 Chino and Shinkai were told by Tony Piazza, an American Honda employee, and Don English, the head of American Honda's personnel administration department, that Billmyer was soliciting and taking bribes from certain dealers. They told Chino that they had discovered that Billmyer held secret ownership interests in several Honda dealerships and had solicited a bribe from a dealer for between $30,000 and $100,000. Chet Hale, an executive vice president and director of American Honda, also informed Chino that Billmyer held secret ownership interests in Honda dealerships.

♦ In or about August 1986 Shinkai discussed with English and Piazza another complaint, received by Piazza from a dealer, that Billmyer had demanded bribes. These allegations later were discussed in a meeting attended by Chino, Shinkai and English. This meeting did not result in any remedial action, and Chino later recommended that Billmyer be made a director of American Honda. The recommendation was followed.

♦ Between 1986 and 1988 Doug Divall, the senior manager of American Honda's and Honda North America's audit group, learned of the alleged kickback scheme. reported it to Chino and asked if he could conduct an investigation. Chino would not allow him to do so.

♦ During the 1980s Cecil Proulx, American Honda's procurement manager, having heard of the kickbacks and improper gratuities, discussed his concerns about them with Shinkai and asked him whether Shinkai and Chino would do anything to stop the corruption. Shinkai told Proulx that the kickback scheme was tolerated by American Honda because American Honda could not afford to pay its executives what

Ford, General Motors or Chrysler would pay them.

♦ Christiaan Walker, an American Honda sales representative, reported to management that he had learned that Stanley J. Cardiges and Edward Temple, respectively the vice president for auto field sales and an American Honda zone manager, had taken a bribe for awarding a Honda dealership. During early 1991, Amemiya and Robert Rivers, a senior American Honda executive, telephoned Robert Mazzitelli, another American Honda zone manager, about Walker's allegations. Amemiya told Mazzitelli not to discuss the matter with Cardiges for fear that it would prompt Cardiges to leave American Honda.

♦ In January 1992 Amemiya met with Rivers at American Honda's corporate headquarters to discuss Walker's allegations and stated: "That is not important now. We have to concentrate on selling cars.... Our priority is sales."

♦ In the mid 1980s Robert Estes, a new Honda dealer, received a telephone call from another Honda dealer, Richard Brooks. Brooks told Estes that Estes would be expected to contribute to a fund for American Honda executives. Estes immediately called a managerial-level executive at Honda Motor in Tokyo and informed him of the alleged fund. No investigation was conducted by Honda Motor as a result of this report.

♦ In or about 1991 Amemiya acknowledged to Roger Novelly, a zone manager for American Honda, that he was aware of the kickback scheme and other corrupt activities.

♦ Subsequently, Amemiya and Okusa met with Rivers again regarding Cardiges' activities. Amemiya asked Rivers to continue to cover up the matters because Amemiya needed to keep Cardiges happy to enable Honda to continue "to sell cars." Amemiya and Okusa also promised Rivers that he would be transferred to the position of vice president of marketing if he cooperated in the coverup.

♦ In June 1992 Okusa was deposed in an action instituted against American Honda by International Automobiles, Inc. before a New Jersey administrative agency. During his testimony Okusa committed perjury when he answered "I do not know" to the question "Has it ever come to your attention that anybody in the employ of American Honda Motor Company has ever received anything of value from any dealer in return for granting of a franchise?"

♦ In September 1994 Munekuni falsely told the FBI that he was not aware of ever having received a letter from Power reporting allegations about the scheme.[1]

## II.

In *Honda I* I stated the following concerning plaintiffs' claims against Honda Motor[2]:

This is a difficult area of the law, one that simultaneously calls for a proper respect for legitimate corporate formalities and a wariness against permitting form to prevail over substance. Generalized and vague pleadings cannot be allowed to circumvent the statutes and common-law rules that protect corporate separateness. Here, however, ... plaintiffs have done more than simply allege that Honda Japan should be held liable for the actions of its American subsidiary and its agents. It has particularized individuals who were closely associated and identified with Honda Japan, who were chosen by it to run a major portion of its worldwide distribution network and who actively participated in what, if plaintiffs' allegations are accepted to be true, can only be characterized as egregious misconduct.

It is facts, not allegations, that will finally determine the outcome of this litigation. Plaintiffs bear the burden of proving not only the underlying bribes and the dam-

---

**1.** Amemiya, Chino, Munekuni and Okusa are also alleged to have accepted gifts of substantial value from several Honda dealers. It is not alleged, however, that they gave preferential treatment to those dealers in return.

**2.** It should be noted that in *Honda I* I referred to the Honda Motor Co. as "Honda Japan," as distinguished from "American Honda." On further consideration, I do not believe it creates any confusion to refer to Honda's Japanese parent simply as "Honda Motor."

ages that they suffered therefrom but also the part played by each of the defendants whom they have named. This will be no easy task. If, however, they produce facts that demonstrate that Honda Japan officials situated in the United States actively were involved in a bribery scheme, that they advised other high-ranking officers and directors of Honda Japan about it and that Honda Japan did nothing to stop the scheme, they will have gone a long way in meeting their burden. They will have gone even further if they can prove that the scheme broadened because of the involvement of executives who were identified with Honda Japan because, for example, dealers were more likely to pay bribes based on their perception that the bribery system was endorsed by the Japanese parent, or that dealers or Honda employees declined to inform anyone about the scheme out of despair or fear of retaliation. And presumably even Honda Japan would concede its liability if plaintiffs could establish that it directed and encouraged the scheme for reasons of its own. These and similar issues must be explored through discovery, and the adequacy of plaintiffs' proof under their various legal theories tested by summary judgment.

941 F.Supp. at 553.

■ I adhere to the views I then expressed. However, I covered a wide spectrum of conduct in describing what plaintiffs might be able to allege and prove against Honda Motor, and I have concluded that I should state with more precision the reasons I believe plaintiffs have stated viable claims against Honda Motor.[3]

■ In considering the broad issue of whether a sole stockholder (individual or corporate) can be held liable for the wrongful acts of its subsidiary, it is helpful to pose several narrower questions. First, can the parent be held liable for the subsidiary's conduct solely by virtue of its ownership of and control over the subsidiary? Obviously, the answer to this question is no, unless the corporate veil can be pierced under conventional doctrines because of inadequate capitalization of the subsidiary, gross disregard of corporate formalities, and the like. *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69–70 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 509, 136 L.Ed.2d 399 (1996). Second, can the parent be held liable if it can be proved that the parent's ultimate decisionmakers regarding the subsidiary's affairs, e.g. the board of directors, executive committee or chairperson of the board, expressly authorized and directed the subsidiary's wrongful acts? The answer to this question is rather clearly yes, since in such an instance the parent is not being held derivatively responsible for the subsidiary's conduct but for its own independent acts as a principal.

■ A third and more difficult question is whether the parent can be held liable for failing to exercise the power it has over the subsidiary to stop illegal conduct engaged in by the subsidiary after having obtained knowledge of it. Common sense suggests that the failure to exercise the strategic control a parent has over a subsidiary to make the latter comply with the law is functionally the equivalent of the parent committing the illegal acts itself. However, well established principles of corporate law dictate that a

---

**3.** In the discussion that follows I have not used such terms as ratification, apparent authority, respondeat superior and the like. These doctrines define the law and provide structure to it in many factual contexts. However, so many different meanings have accreted to them over time that I find that they confound analysis in addressing issues that need to be refined.

Similarly, I am not at all sure (although I referred to them briefly in *Honda I*, 941 F.Supp. at 552 n. 27) that the terms "direct" and "vicarious" liability further understanding in discussing RICO issues. Whatever name is given to the theory of liability, the critical question is whether the illegal conduct alleged was known to and

participated in by sufficiently high-level employees within a corporation and/or was sufficiently pervasive within the corporation as to be fairly attributable to the corporation. *Compare Gruber v. Prudential–Bache Sec., Inc.*, 679 F.Supp. 165, 180–81 (D.Conn.1987) *with R.E. Davis Chem. Corp. v. Nalco Chem. Co.*, 757 F.Supp. 1499, 1522 (N.D.Ill.1990) (extent of high-level participation in illegal activity determines corporation's vicarious (*Gruber*) or direct (*R.E. Davis*) liability). *See also Volmar Distribs., Inc. v. New York Post Co.*, 899 F.Supp. 1187, 1192 n. 5 (S.D.N.Y.1995) (labeling liability direct or vicarious "superfluous," as focus should instead be on theory imputing liability).

subsidiary is presumed to possess a free will, stemming from its corporate separateness, even on occasions of sin, and adoption of a "knowledge plus failure to remedy" approach would be to destroy legal fictions which have become business realities.

■ If this were the end of the inquiry, Honda Motor would be entitled to prevail on its motion to dismiss. For the reasons I stated in *Honda I,* 941 F.Supp. at 551–52, the corporate veil between American Honda and Honda Motor cannot be pierced under traditional doctrine. Likewise, plaintiffs have not alleged sufficient facts from which it could reasonably be inferred that Honda Motor exercised its power as corporate parent to direct American Honda to perpetuate the alleged kickback scheme. It is not sufficient for that purpose merely to assert that several of Honda Motor's directors knew of the scheme and that Honda Motor benefitted from it. Although directors' knowledge might well be imputed to Honda Motor, such knowledge would not be sufficient to give rise to an inference of corporate action since a single director or a minority of directors cannot alone control a parent's board in directing the affairs of the subsidiary. Finally, for the reasons just stated, I reject the theory that a parent can be held liable solely for failing to stop its subsidiary's wrongful acts of which it has knowledge.

■ However, if a parent is not accountable for the sins of its offspring (unless it authorizes and directs them), it is responsible for its own transgressions. Thus, a fourth question that must be asked is whether a parent can be held liable for its subsidiary's wrongs if the parent joins in the commission of those wrongs. The answer to this question is yes, provided that the parent's own conduct is encompassed by the law giving rise to the cause of action. I will address the particular issues raised by the proviso in this case in Section III, *infra.* Before doing so, however, I will explain why this theory of liability is viable even if the subsidiary is a legitimate corporation whose veil cannot be pierced and even if there are insufficient allegations to establish that the parent exercised its control over the subsidiary to direct

the subsidiary to engage in the alleged unlawful conduct.

Let me start with a simple hypothetical. Assume that an individual businessperson, Jacqueline Jones, a resident of Texas, is the sole stockholder of a corporation, XYZ, Inc. Assume further that although Jones may be said to have effective control over XYZ because she appoints its directors who, in turn, choose its officers, XYZ's corporate veil could not be pierced to hold Jones liable for torts or other wrongs committed by XYZ because XYZ is adequately capitalized and corporate formalities have been scrupulously followed.

Make the following assumptions as well. Officers of XYZ embark upon a course of unlawful activity in Maryland which enhances the company's profitability. Jones learns about this activity and is not displeased because it increases the dividends XYZ pays to her as its sole stockholder. Thus, instead of bringing the activity to an end, she directs John Smith, one of her agents from whom she has learned about the activity and who works for her in Maryland, to encourage its perpetuation. Smith is not an officer or director of XYZ but he is widely known among XYZ's employees and dealers as a person quite close to Jones, one who has her ear and carries out her bidding. Over time reports are made to XYZ's management personnel about the illegal activities but, at least partially because of the perception that in light of Smith's involvement the activities have Jones' blessing, nothing is done to curtail those activities. To the contrary, an organized effort, in which Smith himself directly participates, is made to conceal that which has occurred, resulting in the continuation of the illegal activity to the harm of various innocent victims.

Under these circumstances can there be doubt about Jones' liability for damages which were caused by the unlawful activities after she authorized Smith to perpetuate them? Her liability would not be derivative through XYZ. Instead, it would rest upon the fact that she contributed to the continuation of the illegal activities through her direct agent. Neither the formality of the relationship between Jones and XYZ nor the regularity of their finances would be germane to

the theory of liability. Rather, the fact that Jones is the sole shareholder of XYZ and, as such, receives all of its net profits by way of dividends would be relevant only to prove her motivation for participating in the illegal scheme through Smith.

■ This hypothetical differs from what plaintiffs allege against Honda Motor in only three respects: (1) Honda Motor is a citizen of a foreign country rather than a citizen of a state different from the one where the illegal activities are being conducted; (2) Honda Motor is itself a corporation instead of an individual like Jones; and (3) unlike Smith, who is hypothesized to hold no position in XYZ, Amemiya, Chino, Munekuni, Okusa and Shinkai were officers and directors of American Honda as well as being directors of Honda Motor itself. The first difference clearly is immaterial. No doctrine of international law or consideration of comity requires one nation to tolerate the citizen of another sending agents within its borders to promote the conduct of illegal activity.[4]

The second difference is an important one but its importance makes the case against Honda Motor easier to prove than the case against Jacqueline Jones. Because Jones is an individual, in order to state a claim against her, allegations would have to be made that Smith reported the illegal activities to her and that she directed him to encourage their continuation. Since Honda Motor is a corporation and Amemiya, Chino, Munekuni, Okusa and Shinkai were its directors, their own knowledge of the illegal activities and encouragement of the perpetuation of the activities would, rather clearly, seem to be directly imputable to Honda Motor.[5] *See generally United States v. One Parcel of Land,* 965 F.2d 311, 316–17 (7th Cir.1992); Restatement (Second) of Agency § 275 (1958).

The third difference is one which on the surface obfuscates analysis since it brings the question of corporate interrelatedness to the fore. Because Amemiya, Chino, Munekuni, Okusa and Shinkai were officers and directors of American Honda as well as being directors of Honda Motor (unlike John Smith, who is not hypothesized to be an officer and director of XYZ), Honda Motor posits that it cannot bear responsibility for the directors' activities. It takes but little reflection, however, to realize that this change in the hypothesized facts is likewise immaterial to sound analysis. Clearly, a defendant cannot immunize herself from wrongful conduct beneficial to her personally and insulate herself from liability that she would otherwise incur simply by also designating her personal agent as an officer and director of a corporation of which she is the sole stockholder. Although sometimes a phrase of uncertain meaning, the familiar maxim that the corporate veil can be used only as a shield and not as a sword expresses an essential truth which protects the law from being so easily manipulated.

In summary, plaintiffs have not alleged sufficient facts either to hold Honda Motor liable under a corporate veil piercing theory or to show that Honda Motor, as American Honda's parent, caused American Honda to embark on or perpetuate its illegal course of conduct. However, plaintiffs have alleged sufficient facts to demonstrate that Amemiya, Chino, Munekuni, Okusa and Shinkai joined in the kickback scheme in their capacity as directors of Honda Motor, and for its benefit, by encouraging, concealing and obstructing investigations of the scheme. These actions are imputable to Honda Motor

---

4. The effectiveness of service of process upon the foreign citizen and the enforceability of any judgment that might ultimately be rendered are, of course, separate questions. However, neither of these questions is before me now. All that I am now called upon to decide is whether plaintiffs have stated a claim against Honda Motor.

5. Even if it were to be argued that Honda Motor's liability depended upon Amemiya, Chino, Munekuni, Okusa and Shinkai reporting back to management in Japan, Honda Motor's motion to dismiss should be denied. Although plaintiffs make no express allegation to that effect, it may be reasonably inferred, based on allegations that at least five Honda Motor directors had knowledge of the kickback scheme and that executives were regularly rotated between Japan and the United States, that reports of the scheme were made to high management officials in Japan. This is a matter that lies within the exclusive knowledge of the Honda defendants and if it is an element of plaintiffs' claims (which is doubtful), plaintiffs are entitled to discovery on it.

by virtue of its directors' status in that corporation.

## III.

The next question that must be considered is one upon which I deferred ruling in *Honda I:* whether the acts allegedly committed by Amemiya, Chino, Munekuni, Okusa and Shinkai and imputable to Honda Motor are sufficient to establish violations by Honda Motor of the RICO provisions upon which plaintiffs rely. I find that plaintiffs' allegations are not sufficient as to the claims asserted under §§ 1962(a) and (b) because there are elements of those claims that the conduct of Amemiya, Chino, Munekuni, Okusa and Shinkai does not satisfy. Since no substantive allegations are made against Honda Motor other than those relating to the conduct of its directors, this is a fatal pleading defect. However, I find that the conduct of Messrs. Amemiya et al. satisfies each element of plaintiffs' §§ 1962(c) and (d) claims.

## A.

■ Section 1962(a) requires plaintiffs to demonstrate, *inter alia,* that Honda Motor (1) received income directly or indirectly from a pattern of racketeering activity, and (2) used or invested, directly or indirectly, any part of that income in the operation of an enterprise engaged in or affecting interstate commerce. *United States v. Vogt,* 910 F.2d 1184, 1194 (4th Cir.1990). The income that Honda Motor is alleged to have received was the increase in the net profits it earned from American Honda, by virtue of the fact that American Honda allegedly had to pay its executives less compensation because of the benefits they derived from the kickback scheme. I remain of the view expressed in *Honda I* that this is a sufficient allegation of income indirectly received from the alleged unlawful activity. Plaintiffs fail, however, to

allege sufficiently that Honda Motor, rather than its American subsidiary, used or invested this income in a RICO enterprise.[6] In this regard, plaintiffs improperly engage in the aggregated pleading I rejected in *Honda I,* 941 F.Supp. at 536.

Plaintiffs allege that corrupted American Honda executives used the income they derived from their illegal activities to obtain ownership interests in bribe-paying dealerships. However, it is not alleged that any of the Honda Motor directors were involved in this conduct. Plaintiffs further allege that "Honda" used the income that it derived from paying its executives reduced compensation to finance its sales and distribution network. Assuming this allegation to be true, it is not an allegation against Honda Motor, since it is undisputed that distribution and sales were exclusively within American Honda's corporate province. There is no allegation that Honda Motor invested the net profits it earned from American Honda back into American Honda. For these reasons plaintiffs have failed to state a claim against Honda Motor under § 1962(a).

■ They also have failed to state a claim against Honda Motor under § 1962(b). Only infrequently can one receive definitive guidance from the statutory language itself when engaging in the casuistry which analysis of RICO's provisions requires. This is such an occasion. Section 1962(b) makes it "unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in ... interstate or foreign commerce." The alleged "enterprise" identified for § 1962(b) purposes in two of the representative complaints (*Borman* and *Breakaway* ) is American Honda. No reasonable basis whatsoever exists for inferring that Honda Motor has

---

**6.** The four representative complaints name several different enterprises in their § 1962(a) allegations. *Borman* and *Breakaway* describe the enterprise as a combination of Honda Motor, Honda North America, American Honda and the bribe-paying dealers. *Austin* alleges four different enterprises: (1) the "Honda Enterprise," composed of Honda Motor, Honda North America and American Honda; (2) the "Honda Dealer Network Enterprise"; (3) the "Honda Con-

spiracy Enterprise," consisting of the corrupt Honda employees and dealers; and (4) the "Honda Association–In–Fact Enterprise," consisting of the three Honda corporations and the conspiring dealers. Finally, *Trans–Oceanic* names each of the three Honda corporations as a separate enterprise. These pleading variations notwithstanding, as I discuss *infra* all of the complaints suffer from the same fundamental deficiency, negating plaintiffs' § 1962(a) claims.

maintained control over American Honda through the kickback scheme or any other pattern of racketeering activity. Honda Motor maintains control over American Honda by virtue of the fact that it is American Honda's sole stockholder and, as such, has ultimate power over it.

▪ *Austin* alleges four different enterprises, the "Honda Enterprise," the "Honda Dealer Network Enterprise," the "Honda Conspiracy Enterprise" and the "Honda Association–In–Fact Enterprise," for the purpose of § 1962(b) just as it does for the purpose of § 1962(a). *See* note 6, *supra.* As Honda Motor properly argues, the "Honda Conspiracy Enterprise" is not a valid RICO enterprise since it is alleged to exist solely to carry out the predicate acts alleged. *See United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d 246 (1981). As for the other three enterprises, the *Austin* allegations are insufficient either because (1) (like the allegations in *Borman* and *Breakaway* ) they ignore the fact that Honda Motor lawfully has control over American Honda, or (2) they fail to show that Honda Motor, as opposed to American Honda, actually controlled the dealer network.

### B.

▪ Section 1962(c) provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Honda Motor argues that plaintiffs have failed to state a claim against it under § 1962(c) because they have not sufficiently alleged that it committed any acts of "racketeering activity." [7]

▪ Although plaintiffs originally alleged five categories of predicate acts sufficient to establish RICO liability—mail fraud, wire fraud, bribery, extortion and obstruction of justice—it is only the mail fraud allegations that effectively remain.[8] In their opposition memorandum plaintiffs concede that they are not relying upon a theory of commercial bribery, and they have not countered Honda Motor's argument that the wire fraud allegations lack sufficient specificity. Further, the only specific allegation made by plaintiffs concerning alleged obstruction of justice under 18 U.S.C. § 1503 by a Honda Motor director relates to false deposition testimony given by Okusa during the course of a state administrative proceeding. Because § 1503 applies only to obstruction of federal judicial proceedings, Okusa's actions cannot constitute a predicate act under RICO. *See. e.g., O'Malley v. New York City Transit Auth.,* 896 F.2d 704, 707–08 (2d Cir.1990). Similarly, although plaintiffs allege that Munekuni lied to the FBI during the course of a criminal investigation, that cannot constitute a predicate act since 18 U.S.C. § 1510 re-

---

**7.** Honda Motor also argues that it cannot be held liable under § 1962(c) because as a "person" alleged to have committed racketeering activity it is not sufficiently distinct from the "enterprise" through which the activity was conducted. In support of this contention, it cites *Entre Computer Centers, Inc. v. FMG of Kansas City, Inc.,* 819 F.2d 1279, 1287 (4th Cir.1987), *overruled on other grounds, Busby v. Crown Supply, Inc.,* 896 F.2d 833, 841 (4th Cir.1990), where the Fourth Circuit held that the person/enterprise distinction was not met when a franchisor was named as the person and its separately incorporated franchisees as the enterprise. Frankly, I question the precedential value of *Entre Computer.* The court reached its conclusion virtually without analysis and the underlying allegations concerning RICO misconduct were quite weak. In any event, *Entre Computer* is clearly distinguishable from the present case since, as Honda Motor emphasizes throughout its various arguments, it has an existence and function (vehicle manufacturing) en-

tirely separate and apart from American Honda. American Honda, as the corporate entity responsible for vehicle distribution, is more analogous to the franchisor in *Entre Computer* than is Honda Motor.

**8.** I focus on the mail fraud allegations because they are the only surviving predicate acts common to all of the complaints. *Austin* and *Breakaway* also contain allegations of extortion by the Honda Motor executives. Under plaintiffs' theory, the executives committed extortion by receiving gifts from dealers who feared adverse economic consequences if they did not comply, as well as directing other Honda employees to pressure dealers into complying. Discovery may demonstrate that the transactions at issue were not motivated by fear, and therefore extortion has not been made out. For the purposes of this motion, however, plaintiffs have adequately alleged extortion as a predicate act.

quires that obstruction of a criminal investigation be accomplished by bribery and no allegations of bribery of an FBI agent are made.

■ Plaintiffs' mail fraud allegations are, however, sufficient. It is true, as Honda Motor argues, that all of the fraudulent mailings alleged, e.g., dealer agreements which falsely represented that American Honda would deal with plaintiffs fairly and distribute Honda products to them in a fair and reasonable manner, were effected under the auspices of American Honda and related to sales and distribution, matters falling within American Honda's exclusive bailiwick. However, according to plaintiffs' allegations, when Amemiya, Chino, Munekuni, Okusa and Shinkai encouraged and concealed the fraudulent scheme pursuant to which the mailings were made, they were serving the interests not only of American Honda but of Honda Motor as well. If this is true, when they committed predicate acts, they were acting in a dual capacity for both corporations.[9]

### C.

■ The only specific challenge that Honda Motor makes to plaintiffs' § 1962(d) claim is that under *New Beckley Mining Corp. v. International Union, United Mine Workers,* 18 F.3d 1161 (4th Cir.1994), an allegation of intracorporate conspiracy is insufficient as a matter of law. If plaintiffs had alleged simply that Honda Motor conspired with American Honda, this argument might have merit. However, plaintiffs have alleged that Honda Motor conspired with Honda dealers to further the illegal kickback scheme. There simply can be no doubt that Honda Motor and Honda dealers are separate entities capable of conspiring with one another.

### IV.

I will now turn to plaintiffs' claims against Lyon & Lyon. According to plaintiffs' allegations, from 1977 through 1995 Lyon & Lyon

was American Honda's general counsel, and Lyon & Lyon attorneys served as voting directors of the company. In addition, in the 1980s and early 1990s, Lyon & Lyon assumed two management responsibilities: (1) conducting regular training sessions at the national sales meetings on American Honda's conflict of interest policy and on dealer communications; and (2) handling all allegations of misconduct in the auto field sales division, including conflict of interest complaints involving dealers or potential dealers.

Plaintiffs assert that in this capacity between 1979 and 1991 Lyon & Lyon received numerous complaints about the kickback scheme. For example, in 1979 Cliff Schmillen, an American Honda director and its executive vice president, acquired a ten percent hidden interest in a Honda dealership. Before acquiring this interest, Schmillen allegedly consulted with Lyon & Lyon and was told that his hidden ownership interest "was acceptable as long as he did not tell anyone." In subsequent years Lyon & Lyon allegedly received at least four other credible complaints about the illegal kickbacks from J.D. Power, Don English, Cecil Proulx and Christiaan Walker. Lyon & Lyon allegedly took no action to end the corrupt activities reported to it.

Plaintiffs further allege that beginning in 1991, after various Honda dealers had filed civil actions, Lyon & Lyon took actions to conceal the kickback scheme that amounted to obstruction of justice. Plaintiffs focus particularly upon the seminal case instituted in the District of New Hampshire by Richard Nault against American Honda. *See Nault's Auto. Sales, Inc. v. American Honda Motor Co.,* 148 F.R.D. 25 (D.N.H.1993). Factual issues as to plaintiffs' allegations of obstruction of justice abound, and the duty that plaintiffs apparently would impose upon Lyon & Lyon attorneys to disclose their own knowledge about illegal activities when a witness was asked about them on deposition is a highly questionable one (at least as to the

---

**9.** At the very least, plaintiffs have sufficiently alleged that Amemiya, Chino, Munekuni, Okusa and Shinkai aided and abetted the commission of

the predicate acts, which is sufficient to constitute a pattern of racketeering activity. *See* Section V, *infra.*

depositions of witnesses other than corporate designees). However, plaintiffs allege that Lyon & Lyon lawyers went further, counseling witnesses to give evasive or incomplete testimony, for example, by telling them that if they lied on the witness stand "a bolt of lightning wasn't going to come out of the sky and strike [them] dead." Further, plaintiffs allege that in response to increasing pressure from the plaintiffs and the court in the *Nault* litigation, Lyon & Lyon and American Honda conducted an investigation of the alleged kickback scheme but intentionally limited that investigation by not interviewing certain key players, including Amemiya, Chino, Munekuni and Okusa. Finally, Lyon & Lyon attorneys allegedly directed American Honda to make false and misleading assertions about the results of the investigation in an evidentiary hearing in the *Nault* case.

## V.

Against the background of these allegations plaintiffs assert claims against Lyon & Lyon under §§ 1962(c) and (d). I will address the § 1962(c) claim first.

## A.

■ There is one phrase of one sentence of § 1962(c) which is critical in analyzing this claim: "it shall be unlawful for any person to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." Short though this phrase may be, for proper analysis it must be further parsed into two sub-phrases: (1) whether a person "participate[d], directly or indirectly, in the conduct of such enterprise's affairs," and (2) whether this participation was "through a pattern of racketeering activity."

The first of these two sub-phrases was interpreted by the Supreme Court in *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct.

1163, 122 L.Ed.2d 525 (1993). The Court held that in order to be found "to conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs," a person must have had an operational or management role in the enterprise. *Id.* at 185, 113 S.Ct. at 1173. I have no difficulty in concluding that, assuming plaintiffs' allegations to be true, Lyon & Lyon played such a role in the enterprise here alleged. According to plaintiffs, for over ten years Lyon & Lyon took on the responsibility of pretending to enforce American Honda's conflict of interest policy and of not following up on dealer complaints in order to perpetuate the kickback scheme. Concealment is a necessary element of any ongoing illegal activity, and a person who is in charge of the coverup plays an operational and management role in the enterprise conducting that activity.

■ It is not enough, however, for a defendant to have "conduct[ed] or participate[d] directly or indirectly, in the conduct of [an] enterprise's affairs" in order for him to be held liable under § 1962(c). He also must have done so "through a pattern of racketeering activity." On the surface this prepositional phrase appears to present an insurmountable obstacle to plaintiffs' claim in this case, at least as to any allegation based upon Lyon & Lyon's alleged activities prior to the *Nault* litigation. "Pattern of racketeering activity" is defined to mean the commission of at least two predicate acts of various federal crimes listed in § 1961(1), here mail fraud.[10] Plaintiffs do not allege that Lyon & Lyon mailed any of the fraudulent materials. Thus, unless aiding and abetting principles apply, Lyon & Lyon cannot be said to have engaged in "racketeering activity." And, although there is some disagreement among the courts on the issue, *compare Department of Economic Development v. Arthur Andersen & Co.,* 924 F.Supp. 449, 477 (S.D.N.Y.1996) *with 131 Main Street Associates v. Manko,* 897 F.Supp. 1507, 1529 n. 20

---

10. In addition, the predicate acts must be related and there must be a threat of continuing activity in order to constitute a "pattern of racketeering activity." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 2900–01, 106

L.Ed.2d 195 (1989). Because the predicate acts allegedly committed by Lyon & Lyon, discussed *infra,* had similar purposes and significantly contributed to a long-term criminal enterprise, I hold that these elements have been met.

(S.D.N.Y.1995), it is becoming conventional wisdom that aiding and abetting liability under § 1962(c) does not survive the Supreme Court's ruling in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), that there is no aiding and abetting liability in a civil action brought under § 10(b) of the Securities Act of 1934.

There is a subtle but profound flaw in this logic. It lies hidden in the breadth of the statement of the premise that aiding and abetting liability does not survive *Central Bank*. I have no quarrel with that proposition to the extent it refers to applying 18 U.S.C. § 2 [11] directly to § 1962(c). Indeed, *Central Bank* aside, the proposition must be true in light of *Reves* itself. For if § 2 were held to apply directly to § 1962(c), the Supreme Court's painstaking analysis in *Reves* of the "participate, directly or indirectly, in the conduct of [an] enterprise's affairs" language would have been all for naught and the "operation or management" test the Court adopted would be drowned in a sea of aiding and abetting allegations. This does not mean, however, that aiding and abetting principles do not apply in considering whether a defendant has participated in the enterprise "through a pattern of racketeering activity," i.e., whether he has committed at least two predicate acts. *See Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 270 (3d Cir.1995). Although 18 U.S.C. § 2 is not separately listed in § 1961(1), presumably when that section refers to various substantive criminal statutes it also encompasses within them § 2 which, by its terms and by long established case law, is sufficient to establish substantive liability. *See Manko*, 897 F.Supp. at 1529 n. 20.

The distinction I am drawing between finding direct application of § 2 to § 1962(c) (which I believe to be implicitly prohibited by *Reves*) and applying § 2 to the substantive offenses listed in § 1961(1) for the purpose of determining whether a defendant has committed a predicate act may seem sophistic, bringing through the back door that which *Reves* bars at the front. In my view, however, the distinction is key to a proper understanding of *Reves*, and it brings within the ambit of § 1962(c) precisely those defendants who belong there. Unless the distinction is recognized, in most cases there would be no principled basis for imposing § 1962(c) liability upon a class of defendants whom Congress surely intended should be within the statute's purview: leaders of enterprises who do not themselves commit predicate acts but who cause others to do so.[12] This is so because the liability of such principals is created by § 2(b) just as aiding and abetting liability is created by § 2(a). Thus, if § 2 is read out of § 1961(1), the highest-level managers of a criminal enterprise who leave the hands-on

---

**11.** 18 U.S.C. § 2, entitled "Principals," states, in full, that

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

**12.** I say "in most cases" because some of the statutes listed in § 1961(1) themselves render culpable not only persons who commit the prohibited acts but also persons who cause the acts to be committed. For example, the principal predicate acts in this case are violations of the mail fraud statute, 18 U.S.C. § 1341, which uses the words "causes to be deposited" and "causes to be delivered" within its own terms, as do several of the other offenses contained within § 1961(1) (e.g., 18 U.S.C. §§ 1343 (wire fraud), 1461 (mailing obscene material), and 2251(c)

(printing or publishing child pornography)). Although it could be inferred that such language was intended to implicate those who direct or cause others to commit those criminal acts, it is at least equally likely that these phrases were included because those infractions frequently or necessarily involve innocent actors who actually do the delivering or printing. For example, it is the postal service that actually "delivers" a piece of mail—the sender only "causes" it to be delivered by dropping it in a mailbox. In any event, several of the other predicate acts listed in § 1961(1) do not contain similar language, yet RICO is clearly intended to implicate persons who repeatedly direct others to commit such crimes (e.g., 18 U.S.C. §§ 1503 (obstruction of justice) and 1512 (witness tampering)). The only way for such persons to be prosecuted under § 1962(c) is to find that they are principals under § 2(b).

work to others would be excluded from liability under § 1962(c) by virtue of the "through a pattern of racketeering activity" phrase.

Of course, it is the relatively rare case in which a person who can be held liable for a substantive offense only as an aider and abetter would meet the "operation or management" test of *Reves* for determining the necessary level of "participation." If plaintiffs' allegations are true, however, this is such a case. Although Lyon & Lyon may only have aided and abetted the commission of the predicate acts of mail fraud, as indicated above its management role in concealing the scheme is sufficient to meet the "operation and management" test of *Reves.* Plaintiffs have therefore stated a viable § 1962(c) claim against Lyon & Lyon.

### B.

Plaintiffs also argue that, aside from Lyon & Lyon's alleged role as manager of the concealment aspect of the kickback scheme, Lyon & Lyon committed various predicate acts of racketeering during the course of the *Nault* litigation, primarily obstruction of justice. Lyon & Lyon argues that these allegations are insufficient in various respects, including (1) the failure of the factual allegations to make out a substantive offense, (2) the insufficiency of the allegations to meet § 1962(c)'s "pattern" requirement, and (3) the absence of any causative connection between Lyon & Lyon's alleged misconduct in *Nault* and the harm allegedly suffered by plaintiffs.

All of these are knotty issues; the sufficiency of the allegations concerning causation are particularly conclusory and weak. However, I need not decide these questions at the present time because, as I have indicated, I find the plaintiffs' allegations sufficient to state a § 1962(c) claim against Lyon & Lyon for its asserted management role in the concealment of the kickback scheme throughout the scheme's purported existence. Thus, plaintiffs' allegations concerning the *Nault* litigation need not separately and independently state a RICO claim. It is sufficient

that, if true, they serve to prove the continuing management role played by Lyon & Lyon in the enterprise's affairs.

### C.

In *Honda I,* I deferred ruling upon the question of "the interrelationship between *Reves* and § 1962(d) claims in the outside advisor context" until another day. 941 F.Supp. at 560–61 n. 40. I will continue to do so since plaintiffs have made sufficient allegations to show that Lyon & Lyon was not simply an outside advisor. I did not, however, mean to suggest in *Honda I* that a defendant can escape a conspiracy claim simply by characterizing herself as an "outside advisor." The ultimate issue in any § 1962(d) case is whether a defendant's knowledge of the nature, scope and operations of the illegal scheme are such that it can be inferred "that he agreed that another violate [§ ] 1962(c) by committing two acts of racketeering activity." *United States v. Pryba,* 900 F.2d 748, 760 (4th Cir.1990) (quoting *United States v. Joseph,* 781 F.2d 549, 554 (6th Cir.1986)). This is as true now as it was before *Reves* was decided, and plaintiffs have alleged sufficient facts from which it can be inferred that Lyon & Lyon for many years knew and agreed that acts of mail fraud would be committed in furtherance of the alleged kickback scheme.

### VI.

Honda Motor has filed a motion asking that I certify my order denying its motions to dismiss for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The motion will be granted. I am satisfied that the order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." I also believe it appropriate that a ruling by a single judge on issues of far-ranging importance to a citizen of a foreign nation, such as Honda Motor, be subject to effective and prompt review to prevent the

appearance that power has been arbitrarily exercised.

█ Whether I should stay discovery against Honda Motor during the pendency of the appeal involves balancing conflicting interests. On the one hand, the type of discovery to which Honda Motor can be subjected turns upon whether it remains as a party defendant. Therefore, denial of a stay would deprive Honda Motor of substantial rights were it ultimately to prevail on appeal. On the other hand, this litigation is extremely complex and involves the rights and potential liability of numerous parties. The wrongs alleged are said to have begun more than 15 years ago, and it is time for them to be remedied if, in fact, they were committed. I have a duty to the litigants, the transferor courts, and the multidistrict panel to keep the litigation moving at a brisk pace and on a steady course.

Against this background I believe it appropriate that I enter a stay for the limited period of 45 days. This will provide sufficient time for the Fourth Circuit to decide after hearing from the parties whether the interlocutory appeal should be allowed and, if so, whether the stay of discovery should be extended. If the Fourth Circuit does not permit the appeal, or if it determines that discovery should not be stayed in any event, the depositions of Messrs. Munekuni, Okusa and Shinkai which have been scheduled for this spring (after considerable negotiations among the parties) can proceed.