**LOCAL 875 I.B.T. PENSION FUND, Chris McCloughlin and Hezekiah House Jr. as Trustees of the Local 875 I.B.T. Pension Fund, Plaintiffs,**

v.

**Sanford E. POLLACK, Burton J. Horowitz, Horowitz and Pollack, P.C., Infinity International Investments Ltd., Mulk Raj Dass, Chloe Peterson, Glenn P. Pellegrin James T. Kalyvas, Compagnie D'Etudes Et De Participations S.A., Nigel Stovin–Bradford, Frederick Gevers, Joachim D'Souza, Stewart N. Altman and Stewart N. Altman and Associates, P.C., Defendants.**

No. 95CV3989 (NG)(MLO).

United States District Court, E.D. New York.

Jan. 26, 1998.

David M. Schlecke, Kevin N. Starkey, Anderson, Kill & Olick, New York, NY, Michael L. Winston, Cohen, Weiss and Simon, New York, NY, for Plaintiffs.

Celia Goldwag Barenholtz, Kronish, Lieb, Weiner & Helman, LLP, New York, NY, for defendant Compagnie D'Etudes et de Participations, S.A.

Robert D. Piliero, Piliero, Goldstein, Jenkins & Hall, LLP, New York, NY, for defendant Frederick Gevers.

George O. Richardson, III, New York, NY, for defendant Nigel Stovin–Bradford.

Joachim D'Souza, pro se.

Thomas Byrne, Silverman, Collura & Chernis, New York, NY, for defendants Stewart N. Altman and Stewart N. Altman & Associates, P.C.

Christopher P. Foley, Walsh & Sheehan, LLP, New York, NY, for defendants Burton Horowitz, Sandford Pollack and Horowitz & Pollack, P.C.

Stephen E. Hale, Tulsa, OK, for defendants Mulk Raj Dass, Chloe Peterson and Infinity International Investments, Ltd.

Keith A. Ward, Richardson Law Firm, Tulsa, OK, for defendant James T. Kalyvas.

## OPINION AND ORDER

GERSHON, District Judge.

The plaintiffs allege that the Local 875 I.B.T. Pension Fund ("the Fund") has been defrauded of $9.3 million—over 20 percent of its assets because it was induced to devote that sum to an investment plan that was actually a scheme to steal the money through financial subterfuge. They seek recovery under the Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, the Racketeer Influenced and Corrupt Organizations Act ("RICO"). 18 U.S.C. §§ 1861 *et seq.*, the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, and the common law. Various defendants have now moved for dismissal for lack of personal jurisdiction, failure to plead fraud with particularity and failure to state a claim upon which relief may be granted.

## THE AMENDED COMPLAINT

The Amended Complaint, which was filed on July 8, 1996, is a document consisting of over two hundred paragraphs that detail a complex scheme carried out on two continents by numerous individuals and entities.

## A. The Inducement to Invest.

The Fund is a pension plan and trust, established pursuant to collective bargaining agreements, that provides retirement benefits to the members of Local 875, a labor union affiliated with the International Brotherhood of Teamsters. ¶ 7.[1] The Fund is administered at offices located in Elmhurst, New York by a board of trustees (collectively "the Trustees"), whose members include the plaintiffs Chris McLoughlin and Hezekiah House, Jr. ¶¶ 7–9.

The Fund formerly retained Horowitz & Pollack, P.C. ("H & P"), a New Jersey professional corporation, as its outside legal counsel. ¶ 12. In the summer of 1993, Sanford Pollack, one of H & P's principals, approached the Trustees with an investment opportunity. ¶¶ 10, 31. Pollack explained that for $9.3 million the Fund could purchase a 10-year note, issued by one of the "top twenty-five" banks in Europe, with a face value of $10 million, which would yield interest at a rate of 7.5% ("the Note"). ¶ 32. Pollack also represented that the purchase of the Note would be a "risk-free" investment because 1) the funds for its purchase would be maintained in a trust account in the United States controlled by H & P, and 2) these funds would not be transferred out of the account until the Note was delivered, at which point the Note would serve as its own security until it was sold again. ¶ 33. On November 11, 1993 the Trustees forwarded a letter with instructions to purchase the Note to Michael Hedges of the New York City office of the investment firm of Bear Stearns. ¶ 34 [2]

At a meeting of the Trustees on December 14, 1993, H & P resigned as outside counsel to the Fund both because it legal performed legal services for Bear Stearns and because it stood to receive commissions on the transaction involving the Note. ¶ 37. Stewart N. Altman, Esq. of Stewart N. Altman & Associ-

---

1. References to "¶ ___" are to paragraphs of the Amended Complaint, dated April 25, 1996.

2. At the time, Hedges was a managing director at Bear Stearns. ¶ 27. Hedges is alleged to have been a member of the conspiracy to defraud the Fund, ¶ 29, and was named as a defendant in the original complaint filed in this action. However, on October 30, 1995, Hedges filed a personal bankruptcy petition in the United States Bankruptcy Court for the Southern District of New York, ¶ 113, and, accordingly, has not been named as a defendant in the Amended Complaint.

ates, P.C., a New York professional corporation, was then named as H & P's replacement. ¶¶ 23,37. However, as will be seen, H & P did not leave the scene.

On February 14, 1994 Edward Wright of Prudential Securities, the Fund's "investment monitor," ¶ 36, sent a letter to the Trustees, which enclosed a recent Securities and Exchange Commission ("SEC") bulletin. The bulletin discussed a rise in fraudulent investment schemes involving transactions in "prime" bank notes supposedly issued by European banks. ¶ 43. Although Altman became aware of the SEC bulletin, the information contained therein did not motivate him to undertake any investigation of the Fund's investment in the Note. ¶¶ 45–46. When Pollack was made aware of the SEC bulletin, he assured the Trustees that the investment in the Note in no way approximated the fraudulent schemes described in it. ¶ 47.

## B. The Transfer and Misappropriation of the $9.3 Million.

At this point, a host of new players must be introduced. Infinity Investments Ltd. ("Infinity") is a Louisiana corporation with its principal place of business in Houston, Texas. ¶ 13. Mulk Ram Dass is the sole shareholder, sole director and president of Infinity. ¶ 14. James T. Kalyvas was the "secretary and/or agent" for Infinity; and Chloe Peterson and Glenn P. Pellegrin were employees of the firm. ¶¶ 15–17.

Compagnie d'Etudes et de Participations S.A. ("CEPA") is an investment management firm with its principal place of business in Geneva, Switzerland. ¶ 19. Approximately one-third of CEPA, and four of the eight seats on its board of directors, are held by Compagnie de Gestion et de Banque Gonet S.A. ("Bank Gonet"), a Swiss bank that also has its principal place of business in Geneva. ¶ 50. Frederick Gevers, a citizen and resident of Switzerland, was a manager employed by CEPA and, as such, acted as CEPA's agent. ¶ 20.[3] Nigel Stovin–Bradford, a citizen and resident of the United Kingdom, is "a long-time associate" of Gevers. ¶¶ 18,20.

On March 2, 1994, Hedges of Bear Stearns had a conference call with Dass and Kalyvas. ¶ 49. Hedges represented that $10 million of the Fund's money was now in a Bear Stearns account and was available for purchase of the Note, a representation he repeated in an April 5, 1994 letter to Dass. ¶ 49. Accordingly, in late May 1994 Dass sent Pellegrin to Europe for the purpose of opening an account at Bank Gonet. ¶ 50. Thus, on May 25, 1994 an account was opened in the name of Dass and Pellegrin on behalf of Infinity, with Stovin–Bradford having power of attorney to act as Pellegrin's representative in dealings with Bank Gonet. ¶ 50.

Shortly thereafter, Peterson opened an account at Republic Bank in New York City, naming H & P as beneficial owner. ¶ 51. Also at this time, Infinity appointed Horowitz as "attorney in fact" with respect to the $9.3 million of the Fund's money meant for purchase of the Note. ¶ 52. On June 20, 1994 Dass directed Horowitz and/or Pollack to inform the Trustees that the Note would be delivered to the Fund's account at Bear Stearns after the $9.3 million was transferred to the account at Republic Bank. ¶ 53. The Trustees effected this transfer the following day. ¶ 54.

By directing that the transfer of funds take place, the Trustees had unwittingly aided the cause of the conspirators arrayed against them. Republic Bank serves as the "dollar holding correspondent" for Bank Gonet, which means that the account opened there by Peterson was actually an account controlled by CEPA through Bank Gonet. ¶ 55. Indeed, on June 22, 1994, without the Note having been delivered to the Fund's account at Bear Stearns, the $9.3 million in the Republic Bank account was electronically transferred by CEPA and Gevers to the account opened by Pellegrin at Bank Gonet in Geneva. ¶¶ 56–57.

There now began a series of misappropriations from the account at Bank Gonet. On or about June 24, 1996, at least $100,000 of the

---

**3.** Gevers declares that he is actually a citizen of the Netherlands. He does not, however, argue that the plaintiffs' mistake as to his citizenship has any consequence with respect to the question of whether the Court has personal jurisdiction over him.

money in the account was transferred to a bank account in Houston controlled by Infinity and/or Peterson. ¶ 59. On or about December 20, 1994 a total of $400,000 was transferred to various accounts controlled by Infinity and/or its agents. ¶ 60. Stovin–Bradford also siphoned off funds in the account for his own use. ¶ 62.

Most importantly, Stovin–Bradford arranged for the bulk of the money in the account at Bank Gonet to be transferred to Joachim D'Souza, a resident of Milan, Italy. ¶¶ 21, 64. To effect this transfer, Stovin–Bradford worked with D'Souza and Gevers to develop a document in which Gevers, on behalf of CEPA, declared that the funds being transferred were "clean, clear of non-criminal origin [sic] and from a legal source." ¶ 66. Thereafter, on or about July 5, 1994 Stovin–Bradford and Pellegrin authorized the transfer of $8.3 million from the account at Bank Gonet to an account in D'Souza's name at Deutsch–Schweizerishe AG ("DSB"), a German bank. ¶ 66.

D'Souza was engaged in an effort to purchase a major share of DSB. The $8.3 million that had been transferred to his account at DSB was intended as partial satisfaction of an agreement between D'Souza and DSB pursuant to which he was to guarantee loans DSB had made to certain Turkish banks. ¶ 69. However, when D'Souza failed to make additional payments pursuant to this agreement, DSB seized the $8.3 million. ¶ 70.[4] In turn, in November 1994 DSB was closed by German banking authorities (for reasons not disclosed in the Amended Complaint), which then began to liquidate its assets. ¶ 73.

### C. The Misrepresentations.

Any concerns expressed by the Trustees were put off by a series of misrepresentations communicated to them by several of the defendants. Most of these were statements to the effect that delivery of the Note was imminent. Thus, on July 15, 1994 Gevers sent a letter to Stovin–Bradford stating that "the Pre–Advice" for the purchase of the Note would be sent to Bear Stearns "no later

than 5 p.m., N.Y. time, Tuesday, July 19, 1994." ¶ 78. This letter was in turn faxed to Horowitz and Pollack. ¶ 78.

On July 28, 1994 Kalyvas sent letters to Gevers and Horowitz that memorialized the substance of a conversation he had with Gevers on that date. Specifically, Kalyvas related that Gevers had declared that a note from the Union Bank of Switzerland would be "available" by no later that August 1, 1994. ¶ 79. The following day, Stovin–Bradford sent a letter to Horowitz further confirming that "the paper was 'on order.'" ¶ 79. On or about August 11, 1994 Hedges reported to Horowitz the substance of a conversation that he had with Gevers in which the latter had opined that "everything looks good" with respect to obtaining the Note. ¶ 80.

That 8.3 million of the Fund's money had been transferred to D'Souza's account and then seized by DSB did not stem the tide of misrepresentations. On September 23, 1994 Stovin–Bradford sent a letter to Peterson declaring that delivery of the Note would take place the following week. ¶ 86. This letter was forwarded to Pollack, who put it before the Trustees at their September 27, 1994 board meeting. ¶ 86. Similarly, on October 14, 1994 Gevers sent a letter to Stovin–Bradford in which he "confirm[ed] that the net purchase price has been sent and is blocked for the purchase of the paper.... The paper is to be delivered to Bear Stearns as soon as received." ¶ 82. This letter was also forwarded, through Pollack, to the Trustees. ¶ 82.

The defendants did more than assert that the purchase of the Note was imminent. On October 28, 1994, the sum of $150,262 was transferred from the Bank Gonet account to the Fund's account at Citibank in New York. ¶ 93. Peterson explained in a letter of the same date that this payment represented interest accrued on the Fund's money through October 31, 1994. ¶ 94. In reality, however, this was not a bona fide interest payment, but was instead a payment back to the Fund of the remnant of its own money that was left in the Bank Gonet account. ¶ 94.

---

**4.** The precise date on which DSB seized the funds is not stated in the Amended Complaint. However, the seizure took place before August 11, 1994, because on that date both Stovin–Bradford and Gevers communicated with DSB regarding the seizure. ¶ 71.

In spite of a further series of misrepresentations, made largely by Pollack, a representative of Prudential Securities ascertained on or about March 17, 1995 that the $8.3 million had been transferred to DSB. ¶ 100. However, even after this information had been related to the Trustees, various defendants still attempted to quell any further inquiry. Thus, on April 12, 1995, Peterson sent Altman a statement she had received from Stovin–Bradford that represented that the "[p]aper to cover the $10M face is already cut." ¶ 104. This was followed by another letter from Stovin–Bradford that was sent to Altman on May 3, 1995 that declared that the Note would be "released" after a meeting that Stovin–Bradford was to have with a representative of the (presumably American) Federal Reserve. ¶ 105. Similarly, in a letter that Altman received on May 23, 1995, Stovin–Bradford asserted that Federal Reserve approval was the only thing delaying the delivery of the Note. ¶ 108. Indeed, as late as September 11, 1995, shortly before this action was filed, Stovin–Bradford wrote Altman directly to declare that the Note was going to be delivered. ¶ 110.

The Trustees have to date been unsuccessful in their efforts to recover any portion of the $8.3 million from the German banking authorities. ¶ 73. They have also discovered that whatever was left in the account at Bank Gonet, after all of the transfers set forth above, was itself transferred on or about February 1, 1995 to a bank account in the United States in Pellegrin's name. ¶ 63. Further, it is perhaps needless to say that the Fund has never received the Note. Thus, the Fund has suffered the loss of its entire $9.3 million investment.

### D. The Claims.

The Amended Complaint sets forth thirteen counts:

**Count One**—Securities Fraud and Conspiracy to Commit Securities Fraud, against the H & P Defendants,[5] the Infinity Defendants,[6] Stovin–Bradford, Gevers, CEPA and D'Souza, in violation of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5;

**Counts Two and Three**—RICO and RICO Conspiracy against the H & P Defendants, the Infinity Defendants, Stovin–Bradford, Gevers, CEPA and D'Souza;

**Count Four**—Breach of Fiduciary Duty Under ERISA against the H & P Defendants, all of the Infinity Defendants save for Kalyvas, Stovin–Bradford, Gevers, CEPA, and D'Souza;

**Counts Five, Six, Seven and Eight**—Common Law Breach of Fiduciary Duty, Fraud, Conversion and Money Had and Received against Kalyvas and, as an alternative to Count Four, against the H & P Defendants, all of the Infinity Defendants save for Kalyvas, Stovin–Bradford, Gevers, CEPA, and D'Souza;

**Count Nine**—Negligence and/or Recklessness against Kalyvas and, as an alternative to Count Four or to a finding of fraud under Count Seven, against the H & P Defendants, all of the Infinity Defendants save for Kalyvas, Stovin–Bradford, Gevers, CEPA and D'Souza;

**Counts Ten and Eleven**—Breach of Contract and Action for Accounting against Gevers, CEPA, the H & P Defendants, the Infinity Defendants, Stovin–Bradford and D'Souza;

**Count Twelve**—Attorney Malpractice against Altman and Altman and Associates, P.C.; and

**Count Thirteen**—Attorney Malpractice against the H & P Defendants.

### E. The Instant Motions.

The four European defendants—CEPA, Gevers, Stovin–Bradford and D'Souza—have filed motions to dismiss the Amended Complaint as to them. CEPA and Gevers assert that this action should be dismissed as to them for lack of personal jurisdiction, for failure to meet the pleading requirements of

---

**5.** The Amended Complaint refers collectively to Horowitz, Pollack and H & P itself as "the H & P Defendants."

**6.** The Amended Complaint refers collectively to Infinity, Dass, Peterson, Pellegrin and Kalyvas as "the Infinity Defendants."

Rule 9(b) of the Federal Rules of Civil Procedure and for failure to state a claim as required by Federal Rule of Civil Procedure 12(b)(6). CEPA and Gevers have also moved to dismiss cross-claims asserted against them by the H & P Defendants.

Stovin–Bradford and D'Souza, who is *pro se*, have filed motions to dismiss for lack of personal jurisdiction and for failure to state a claim.

Finally, Altman and his firm have filed a motion to dismiss the single claim asserted against them, that of attorney malpractice, for failure to state a claim. If the claim is not dismissed, they ask that supplemental jurisdiction pursuant to 28 U.S.C. § 1367 not be exercised over the claim.

## I. PERSONAL JURISDICTION

### A. General Considerations.

■■ "On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over [a] defendant." *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 566 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996). A district court has "considerable procedural leeway" in deciding a Rule 12(b)(2) motion. *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir.1981). Here, some discovery has been taken on jurisdictional issues, but the court has not held an evidentiary hearing on the issue of the exercise of personal jurisdiction. In this procedural posture, the plaintiffs need only make a *prima facie* showing that personal jurisdiction exists, but this showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction." *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d at 567 (quotation omitted). In deciding the motion, all pleadings and affidavits must be construed in the light most favorable to the plaintiffs, and all doubts resolved in their

favor. *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir.1985).[7] However, in a case involving non-U.S. parties, the court must be mindful of the Supreme Court's admonition that "(g)reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 115, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

### B. The New York Long Arm Statute.

■■ "Personal jurisdiction of a federal court over a non-resident defendant is governed by the law of the state in which the court sits—subject, of course, to certain [federal] constitutional limits of due process." *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir.1994). Under New York's "long-arm" statute, N.Y.C.P.L.R. § 302:

> 1) the Court must determine whether [Section 302] provide[s] a basis for personal jurisdiction, and 2) if [it does], the Court must then conduct a constitutional inquiry to determine whether the exercise of personal jurisdiction over the defendant would offend due process pursuant to *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny.

*Sunrise Industrial Joint Venture v. Ditric Optics, Inc.*, 873 F.Supp. 765, 770 (E.D.N.Y. 1995) (citation omitted).

Section 302, in relevant part, reads as follows:

> (a) Acts which are the basis of jurisdiction. . . . (A) court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:
>
> · · ·
>
> 3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of

---

7. In support of their assertion that personal jurisdiction exists as to CEPA and Gevers, the plaintiffs have submitted declarations from two of the Infinity Defendants, James Kalyvas and Chloe Peterson. The moving defendants contest these declarations on the ground that they have been composed for self-serving reasons. Given the adequacy of the plaintiffs' showing, without regard to the statements made by these declarants, their statements are not considered on this motion, and the question of the weight to be given them need not be addressed.

action for defamation of character arising from the act, if he

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; . . . .

## C. Personal Jurisdiction as to CEPA and Gevers.

■ Personal jurisdiction lies as to CEPA and Gevers pursuant to Section 302(a)(3)(ii) because the plaintiffs have made out a *prima facie* case that CEPA and Gevers 1) derive substantial revenue from international commerce and 2) have committed tortious acts outside of New York that they knew, or reasonably should have known, would have consequences within New York.

With respect to the issue of revenue, the plaintiffs, by reference to a CEPA brochure that describes CEPA's participation in major financial markets across the globe, assert that CEPA derives regular and substantial income from international commerce. Winston Decl., Ex. J at C00096–C00103. *See Bensusan Restaurant Corp. v. King,* 126 F.3d 25, 29 (2d Cir.1997) ("substantial revenue" requirement serves to exclude foreign entities whose business operations are purely local in character). CEPA does not contest that this aspect of the plaintiffs' burden has been met. *See Marine Midland Bank v. Keplinger & Assocs., Inc.* 488 F.Supp. 699, 703–04 (S.D.N.Y.1980) (representations in defendant's brochure sufficient to establish *prima facie* case that defendant derives substantial revenue from interstate commerce).

The plaintiffs have also alleged that Gevers personally derives substantial revenue from international commerce. Gevers, who admits to having worked "throughout the years" with firms involved in international com-

merce, Gevers Aff. at ¶ 5, has offered nothing that defeats these allegations. For example, he has not demonstrated that the international transaction at issue in this case was atypical of his business experience. Further, I am not persuaded by his argument that, although he has long worked for firms engaged in international commerce, he himself does not derive income from international commerce because his "compensation" is paid by employers located in Switzerland. *Id.* He provides no support for the proposition that the local origin of one's paycheck precludes a finding that one's income is *derived* from international commercial transactions. Thus, I find that the plaintiffs have made a *prima facie* case that Gevers derives substantial income from international commerce. *See PC COM, Inc. v. Proteon, Inc.,* 906 F.Supp. 894, 905–06 (S.D.N.Y.1995) (unrebutted allegations of receipt of substantial income from interstate commerce sufficient for *prima facie* case).

Turning to the heart of the matter, I find that the plaintiffs have alleged acts on the part of Gevers of sufficient quantity and quality to allow for the proper exercise of jurisdiction as to him and, by imputation, as to CEPA. Gevers, at least at the time the activities alleged in the Amended Complaint took place, was a manager of CEPA and, hence, its agent for whose tortious conduct it may be held responsible. *Riviello v. Waldron,* 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 391 N.E.2d 1278 (1979). Section 302(a) expressly allows for the exercise of personal jurisdiction over those who commit tortious acts through an agent. Thus, acts committed by Gevers within the scope of his employment, or with the apparent authority of CEPA, may be imputed to CEPA because the New York-related activity of a corporate officer, director or employee may subject both the corporation and the individual corporate representative to jurisdiction. *Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988).[8]

---

8. Although it is not alleged that Gevers committed any jurisdictionally significant acts while actually being present in New York, Section 302 contains no requirement of physical presence of the agent in New York. The statute requires only

that acts have foreseeable *consequences* in New York, not that they be performed here. *Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d at 467, 527 N.Y.S.2d 195, 522 N.E.2d 40. Indeed, "it is an inescapable fact of modern commercial life that

Taking its allegations in the light most favorable to the plaintiffs, the Amended Complaint depicts Gevers as an active participant in the fraudulent appropriation of the Fund's assets placed with Bank Gonet. Thus, it claimed that Gevers, in early July 1994, was instrumental in effecting by far the greatest misappropriation of Fund assets— the transfer of $8 million to D'Souza—by preparing a document that represented that these monies were "clean, clear of non-criminal origin [*sic*] and from a legal source." Further, the Amended Complaint alleges that, after this transfer had taken place, Gevers made no fewer than four misrepresentations to the effect that the purchase of the Note, an event which never took place, was imminent. Gevers is also alleged to have communicated with DSB, D'Souza's German bank, regarding its seizure of the $8.3 million transferred to D'Souza. Indeed, two of the four misrepresentations attributed to Gevers concerning the purchase of the Note are alleged to have taken place *after* this seizure of funds, *i.e.*, after Gevers knew, or should have known, that no funds existed in the Bank Gonet account with which to make the purchase.

Both Gevers and CEPA acknowledge, at least implicitly, that, viewed from the perspective most favorable to the plaintiffs, it has been sufficiently alleged that Gevers committed tortious acts. Thus, in the course of arguing that the plaintiffs have not made out a *prima facie* case that he was a participant in a conspiracy with respect to the misappropriation of the Fund's assets, Gevers examines the misrepresentations alleged to have been made by him with respect to the imminent purchase of the Note. He asserts that it would be "impermissible to imply or infer" that any of these statements were occasioned by his participation in a conspiracy because it would be *"just as consistent,"* Gevers Reply Mem. at 12 (emphasis supplied), to view Gevers as being motivated by a desire "to conceal a perceived error on his *own* part in transferring funds" to D'Souza. *Id.* (emphasis in original). Where, as

here, it is at least equally plausible to view Gevers' statements as being motivated by perfidy or shame, the court must, on this motion, opt for perfidy.

Similarly, when discussing Gevers' October 14, 1994 letter to Stovin–Bradford that represented that "the net purchase price has been sent and is blocked for the purchase of the paper," CEPA opines that such communications are typical of the sort of fraudulent scheme alleged by the plaintiffs; in fact, it is "a hallmark" of such schemes to cause "an innocent financial institution to issue statements to make it appear as though the institution is involved in the [fraudulent] transaction." CEPA Reply Mem. at 14. This *"suggest[s]* that Gevers *may have* been tricked into making this statement." *Id.* (emphasis supplied). Implicit in this acknowledgment is the concession that Gevers, on the facts alleged, *may not* have been tricked into making the statement; *i.e.*, that he may have wilfully uttered a falsehood. Again, the court must adopt the latter interpretation in deciding the question of personal jurisdiction as to CEPA and Gevers.

For jurisdictional purposes, the question then becomes whether or not Gevers expected, or reasonably should have expected, that these acts would have consequences in New York. This is an objective inquiry and relates to foreseeability of consequences *generally*, not to an expectation of the specific injury suffered by the plaintiffs. *Fantis Foods, Inc. v. Standard Importing Co.*, 49 N.Y.2d 317, 326 n. 4, 425 N.Y.S.2d 783, 402 N.E.2d 122 (1980). Here, the inquiry resolves itself into the question of whether Gevers knew, or should have known, that the monies deposited in the Bank Gonet account belonged to the Fund. If the plaintiffs can make out a sufficient case that he did have, or should have had, such knowledge, then, although it is not alleged that Gevers at any time communicated directly with the Trustees, his awareness of the origin of the monies in the Bank Gonet account would give rise to the

---

a substantial amount of business is transacted solely by mail and wire communication across state lines, thus obviating the need for physical presence within a State in which business is

conducted." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

expectation that his communications regarding the imminent purchase of the Note would be relayed, in words or substance, to them. Thus, the requirement of Section 302(3)(ii) regarding the expectation of tortious effects in New York would be satisfied.

I find that Gevers' knowledge of the origin of the funds in the Bank Gonet account has been adequately established for jurisdictional purposes. On June 23, 1994, the day after the Fund's $9.3 million was transferred to Bank Gonet in Geneva, Stovin–Bradford wrote to Gevers to confirm "that you have finally received the promised $9.3 million from the USA." Winston Decl., Ex. J. at C00019. The same letter references the Republic Bank account from which the funds were transferred. Internal CEPA documents also reference this account. *Id.* at C00018, C00072. Further, communications from Gevers himself demonstrate his knowledge of the origins of the $9.3 million in the Bank Gonet account. Thus, in two of the communications in which he declared that the purchase of the Note was imminent, those of July 15 and October 14, 1994, Gevers explicitly states that the Note is to be delivered to the offices of Bear Stearns in New York City. Peterson Decl., Ex. F; Kalyvas Decl., Ex. E. Finally, on January 12 and March 3, 1995, after he had made the final misrepresentation attributed to him in the Amended Complaint, Gevers received letters from H & P that demanded the return of the Fund's assets. Winston Decl., Ex. C. Both of these letters contain the reference "Account Name–Local 875 I.B.T. Pension Fund," and the March 3rd letter threatens immediate legal action should the assets not be returned. As the plaintiffs point out, although these letters were sent after his final alleged misrepresentation, there is no evidence that Gevers responded to either of these letters with a denial of knowledge of the origin of the assets. In sum, then, I find that the foreseeability requirement of Section 302 has been satisfied. As a "participant[ ] in an alleged wrongdoing intentionally directed at [New York residents]," *Calder v. Jones*, 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), I conclude that personal jurisdiction exists as to Gevers.

Based upon its agency relationship with Gevers, personal jurisdiction lies with respect to CEPA as well. In an attempt to avoid the imputation of Gevers' jurisdictionally significant acts to it, CEPA argues that any untoward acts that may have been committed by him cannot be imputed to CEPA because Gevers was not CEPA's agent. Specifically, CEPA contends that Gevers "performed work for CEPA, on a contract basis, as an investment manager over accounts which he brought to CEPA." CEPA Reply Mem. at 26. Under Swiss law, according to CEPA, a firm must maintain a list with Swiss authorities of all officers and directors who have been vested with the authority to bind the firm; as a mere contract·employee, Gevers name· does not appear on that list and, therefore, "anyone who dealt with Gevers was on public notice that Gevers was not a manager or director of CEPA, and had no ability to bind CEPA in any way." *Id.* at 27. Thus, CEPA concludes that any fraudulent acts undertaken by Gevers were "a personal frolic ... unrelated to CEPA's business, against CEPA's interest, and therefore not attributable to CEPA for jurisdictional purposes." *Id.* at 28.

 CEPA's argument is rejected for two reasons. First, CEPA has improperly raised an argument based upon foreign law. Federal Rule of Civil Procedure 44.1 provides that "[a] party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice." The purpose of the Rule is "to avoid unfair surprise either to the opposing party or to the court." 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 2443 at 640 (1995). CEPA, however, only raised its argument based upon Swiss law in its reply papers. This is not sufficient notice under Rule 44.1. *See Canadian Imperial Bank v. Saxony Carpet Co.*, 899 F.Supp. 1248, 1253 (S.D.N.Y. 1995) (raising issue of foreign law in opening papers on summary judgment motion was proper notice under Rule 44.1), *aff'd.*, 104 F.3d 352, 1996 WL 629749 (2d Cir.1996).

 Even assuming *arguendo* that Swiss corporate law provides as CEPA represents, and further assuming that Swiss law would

govern CEPA's liability for Gevers' actions, whether the single provision of Swiss law relied upon by CEPA would be dispositive of CEPA's liability is not at all clear. There remain factual questions as to the precise nature of the relationship between Gevers and CEPA, and of the degree of notice of the particulars of that relationship that might be charged to the plaintiffs on the facts of this case. So long as a *prima facie* case of personal jurisdiction as to CEPA and Gevers has been made, it is not necessary to resolve the factual disputes that will affect not only jurisdiction, but the merits. *See Advance Coating Technology, Inc. v. LEP Chemical, Ltd.*, 142 F.R.D. 91, 99 (S.D.N.Y. 1992); D. Siegel, *New York Practice*, § 92 at 143 (2d ed.1991) (noting difference between jurisdiction and merits determinations). Thus, although CEPA directs the Court's attention to cases where the acts of a rogue official or employee were found not to be imputable to the organization to which that individual belonged, none of these cases made this determination in the context of deciding the exercise of personal jurisdiction as to that organization. Their holdings therefore do not preclude a finding that personal jurisdiction may be exercised as to Gevers and CEPA.

■ Having determined that CEPA and Gevers fall within the reach of Section 302, and mindful that New York courts have consistently held that Section 302 does not extend jurisdiction to the furthest extent of due process permitted by the Constitution, *Ingraham v. Carroll*, 90 N.Y.2d 592, 596–97, 665 N.Y.S.2d 10, 687 N.E.2d 1293 (1997), it remains to determine whether the exercise of jurisdiction as to them would comport with due process. This exercise is proper if it is foreseeable "that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (citations omitted). As set forth above, the plaintiffs have made a *prima facie* case that CEPA and Gevers purposely conducted financial transactions that had foreseeable consequences in New York. Basing personal jurisdiction upon the conduct of these transactions does not offend due process. *See Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 619–20, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992).

**D. Personal Jurisdiction as to Stovin–Bradford.**

■ Magistrate Judge Michael L. Orenstein, who is supervising the conduct of discovery in this case, has issued a Report and Recommendation, dated September 16, 1997, reporting that Stovin–Bradford has failed to comply with the plaintiffs' legitimate discovery requests on the issue of personal jurisdiction. Magistrate Judge Orenstein has accordingly recommended that Stovin–Bradford's motion to dismiss for lack of personal jurisdiction be denied. Stovin–Bradford has not filed any objections to the September 16th Report and Recommendation. I now adopt the Report and Recommendation and deny Stovin–Bradford's motion to dismiss him from this action for lack of personal jurisdiction. *See Insurance Corp. of Ireland Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 709, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982) (jurisdictional objection may be forfeited by failure to comply with discovery orders).

**E. Personal Jurisdiction as to D'Souza.**

■ The plaintiffs' principal argument addressed to the exercise of personal jurisdiction over D'Souza is that he has waived any jurisdictional defense because none was raised in his answer to the Amended Complaint. However, D'Souza is a foreign *pro se* defendant and leave to amend the answer would have been readily available. *See* Federal Rule of Civil Procedure 15(a). Accordingly, his motion to dismiss for lack of personal jurisdiction will be considered.

■ It is unnecessary to address all of the elements of Section 302(a)(3) jurisdiction as to D'Souza because the plaintiffs have clearly failed to make a *prima facie* showing as to one of them, namely, that D'Souza expected or reasonably should have expected that his acts would have consequences in New York. D'Souza has expressly denied knowing of the origin of the money until the

original complaint in this case was served upon him. Although the Amended Complaint makes the assertion that "Stovin–Bradford informed D'Souza that the money belonged to the Fund," ¶ 64, no factual support for that allegation is provided, either in the Amended Complaint or in the materials produced in discovery. The plaintiffs point to two documents as establishing D'Souza's knowledge of New York consequences. In a letter from Stovin–Bradford to D'Souza, dated July 1, 1994, Stovin–Bradford describes "the path of the funds" to be transferred to D'Souza. Peterson Decl., Ex. A at 7. The letter states that "Bank Gonet keeps its dollars in its dollar correspondent, Republic National in New York," *id.*, but it neither mentions the Fund as the origin of the money nor in any other way suggests the possibility of New York consequences. Indeed, Stovin–Bradford says in the letter that the funds are held in an "individual client account within CEPA S.A. over which I have control," *id.*, without mentioning either the client or its whereabouts. The second document is a memorandum from Martin Cook, who is alleged to be D'Souza's agent, ¶ 67, which is undated but for a July 12, 1994 facsimile line. Peterson Decl., Ex. A at 13. It reports the receipt of $8.3 million by D'Souza, but makes no mention of the Fund or of New York.

 The plaintiffs' resort to the conspiracy theory of jurisdiction with respect to D'Souza is without merit. To establish personal jurisdiction under Section 302 pursuant to the assertion that a defendant was a member of a conspiracy, it is necessary to "1) make a *prima facie* factual showing of a conspiracy to commit a tort in New York, and 2) allege specific facts warranting the inference that the defendant was a member of the conspiracy." *Biofeedtrac v. Kolinor Optical Enterprises,* 817 F.Supp. 326, 333 (E.D.N.Y.1993). To establish the second element of this standard, the plaintiff must demonstrate, among other things, that the defendant had an awareness of the effects within New York of the conspiracy. *Id.* at 334. As just shown, it is precisely this demonstration that the plaintiffs have failed to make with respect to D'Souza.

In sum, the plaintiffs' showing does not meet the New York statutory standard, much less the federal constitutional standard, for asserting personal jurisdiction over this foreign defendant. I therefore find that D'Souza's motion to dismiss for lack of personal jurisdiction should be granted and that he should be dismissed from this action.

## II. CEPA AND GEVERS' MOTIONS TO DISMISS THE FEDERAL CLAIMS

### A. General Considerations.

In reviewing motions to dismiss under Federal Rules of Civil Procedure 9(b) and 12(b)(6), a court is bound to "accept as true all factual allegations of the complaint, and draw all inferences in favor of the pleader." *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). Indeed, the complaint is to be dismissed "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2, 5 (1996) (citation omitted), *cert. denied,* —— U.S. ——, 117 S.Ct. 2433, 138 L.Ed.2d 194 (1997).

### B. Failure to Plead Fraud With Particularity.

 Federal Rule of Civil Procedure 9(b) provides that allegations of fraud "shall be stated with particularity." In order to satisfy this requirement, allegations of fraud "must be specific enough to give defendants 'a reasonable opportunity to answer the complaint' and must give defendants 'adequate information' to allow defendants to frame a response." *Bharucha v. Reuters Holdings PLC,* 810 F.Supp. 37, 41 (E.D.N.Y.1993) (quoting *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980)). CEPA and Gevers assert that the Amended Complaint does not meet this standard, but this contention must be rejected.

 Generally, allegations of fraudulent misrepresentation are sufficient under Rule 9(b) if they set forth the time, place, speaker and content of the misrepresentations charged against the defendants. *Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d

Cir.1990). The Amended Complaint clearly meets these requirements. As detailed above, it sets forth a series of allegedly fraudulent oral and written misrepresentations made to, or communicated to, the Trustees with respect to the purchase of the Note. Each of these is attributed to an author or speaker, including Gevers, and each is introduced in the course of a chronological narrative about the alleged fraudulent scheme. Finally, the Amended Complaint specifies what various defendants received out of the Fund's $9.3 million in the form of misappropriations and illegitimate commissions.

CEPA and Gevers' principal criticism of the Amended Complaint under Rule 9(b) is that its allegations of conspiracy are unspecific, branding all the defendants, save for Altman and his firm, as participants in a conspiracy without setting forth sufficient information as to *each* participant's supposed role. This argument is misplaced. "Rule 9(b) applies only to fraud or mistake, not to conspiracy. [A plaintiff's] pleading of conspiracy, apart from the underlying acts of fraud, is properly measured under the more liberal requirements of Rule 8(a). Even so, the complaint must allege some factual basis for a finding of a conscious agreement among the defendants." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 26 n. 4 (2d Cir.1990) (citation omitted). There can be no serious argument that the Amended Complaint's conspiracy allegations fail to meet the standard of Federal Rule of Civil Procedure 8(a), which merely requires that the allegations be set forth in "a short and plain statement." And the Amended Complaint, which is replete with allegations of concerted action amongst those defendants, including CEPA and Gevers, alleged to be conspirators, contains ample factual basis for a finding of conscious agreement among them.

CEPA and Gevers also contend that the Amended Complaint violates Rule 9(b) with respect to its scienter allegations. They point out that the Amended Complaint's only specific allegation of what CEPA and Gevers gained from the fraud is that they received "commissions" as a result of their stewardship over the Fund's $9.3 million. ¶ 61. Even

though this stewardship is alleged to have come about as a result of the plaintiffs having been fraudulently induced to invest in the non-existent Note, there is no allegation that these commissions exceeded what CEPA and Gevers would have received from their handling of legitimate accounts. CEPA contends that "the mere allegation of ordinary benefits (such as the ordinary commissions CEPA allegedly received) is insufficient to support an inference of motive." CEPA Reply Mem. at 3–4.

Rule 9(b), however, provides that allegations of "(m)alice, intent, knowledge, and other condition of mind of a person may be averred generally." Accordingly, "[a]llegations of scienter are not subjected to the more exacting consideration applied to the other components of fraud," *Ouaknine v. MacFarlane*, 897 F.2d at 81, "[b]ecause it would be unrealistic to expect a plaintiff to plead a defendant's actual state of mind." *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 184 (2d Cir.1995) (quotation omitted). Instead, "conclusory allegations of scienter that give rise to a strong inference of fraudulent intent" are sufficient. *Id.* (quotation omitted). A complaint may establish an inference of fraudulent intent in one of two ways, either by alleging "a motive for committing fraud and a clear opportunity for doing so," *id.*, or "by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Id.* (quotation omitted).

I have already found, in the context of determining the issue of personal jurisdiction, that the plaintiffs have raised a strong inference of conscious behavior with respect to Gevers and, at least by imputation, CEPA. *Supra*, pp. 558–59. Gevers and CEPA have therefore failed to demonstrate that the Amended Complaint should be dismissed pursuant to Rule 9(b). That, at this time, the evidence of motive is limited to commissions is not a reason to dismiss the Amended Complaint where conscious fraudulent behavior is so clearly alleged.

## C. Securities Law Claim.

The plaintiffs allege in Count One of the Amended Complaint that all of the defendants, save for Altman and his law firm, have committed fraud in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5.[9] To state a claim under Section 10(b) and Rule 10b–5, the plaintiffs "must allege that, in connection with the purchase or sale of securities, each defendant, acting with scienter, made a material false representation, or omitted to disclose material information, or engaged in a scheme to defraud, and that plaintiff[s'] reliance upon defendant[s'] action caused plaintiff[s'] injury." *In re Blech Securities Litigation,* 961 F.Supp. 569, 580 (S.D.N.Y.1997) (citing *Bloor v. Carro, Spanbock Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir. 1985)).

CEPA and Gevers contend that the Amended Complaint fails to satisfy two of the elements of the claim in that: 1) the alleged fraudulent acts did not take place "in connection with" the purchase or sale of securities and that 2) to the extent that the plaintiffs relied upon any statement or omission made by, or attributable to, CEPA or Gevers, no such statement caused them any injury for which the federal securities laws provide relief.

As to the first contention, CEPA and Gevers assert that the nature of the scheme alleged in the Amended Complaint actually precludes a finding that fraudulent acts "in connection with" the purchase or sale of securities are at issue here. As CEPA states, the plaintiffs have alleged "that the conspirators never intended to provide a note for the Fund and that no note was ever obtained." CEPA Mem. at 15. Thus, since the presence of a security in the form of a "prime bank note" was always illusory, the scheme did not

*actually* involve securities and therefore cannot be characterized as a "securities fraud." In other words, the plaintiffs "apparently fell for a confidence game which could just as easily have involved non-existent diamonds or nonexistent real estate." CEPA Reply Mem. at 19.

As CEPA and Gevers assert, a complaint that alleges no more than theft does not state a claim under the federal securities law merely because non-existent securities were used as the bait to effect the theft. *See, e.g., Pross v. Katz,* 784 F.2d 455, 459 (2d Cir.1986). However, because our Court of Appeals admonishes that the "in connection with" requirement should be read in a flexible, not in a technical or reflexive, manner, *In re Ames Dept. Stores Stock Litig.,* 991 F.2d 953, 962 (2d Cir.1993), a Rule 10b–5 claim may be maintained even where a purchase was induced, but the existence of the security at issue was merely purported, not actual. The recent decision in *SEC v. Bremont,* 954 F.Supp. 726 (S.D.N.Y.1997) is particularly instructive. Similar to the fraud alleged here, *Bremont* involved a scheme to induce investors to participate in transactions involving "prime bank instruments" or "PBI's." The defendants proposed that, for a fee, they would obtain purchase orders from banks for PBIs. They would then use investor funds to purchase PBIs from other banks and sell these—at a considerable mark-up—to the banks from which they had obtained purchase orders, thereby fulfilling the purchase orders and reaping substantial profits for the investors. In bringing suit against the defendants, the SEC contended that the scheme was blatantly fraudulent because PBIs, and the market for them, simply do not exist. One of the defendants moved to dismiss the Rule 10b–5 claim by asserting that no subject matter jurisdiction existed as to the claim. As do CEPA and Gevers, he argued that a scheme involving a non-exis-

---

**9.** Count One is styled as a claim for securities fraud and conspiracy to commit securities fraud. However, as CEPA correctly notes, the great weight of judicial authority holds that conspiracy liability under Section 10(b) and Rule 10b–5 has been foreclosed in light of the Supreme Court's ruling in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), which found no aiding and abetting liability under the statute and the rule. *See Kidder Peabody & Co., Inc. v. Unigestion Intern.,* 903 F.Supp. 479, 498 (S.D.N.Y.1995) (collecting cases). I agree and therefore will treat Count One as asserting only a claim of primary liability for violation of Section 10(b) and Rule 10b–5.

tent security was not a scheme "in connection with" the purchase or sale of securities.

The court squarely rejected this argument upon the authority of *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 10, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), in which the Supreme Court admonished that the broad reach of Section 10(b) and Rule 10b–5 prohibits *all* fraudulent schemes in connection with the purchase or sale of securities. 954 F.Supp. at 732. On the face of its complaint, the court continued, "[t]he SEC has demonstrated the likelihood that defendants took large fees, essentially brokerage commissions, for setting up deals for non-existent securities," a scheme which, the court concluded, "clearly satisfies Rule 10b–5's 'in connection with' language,":

> Making substantial misrepresentations as to the value of a worthless but technically extant security is a paradigmatic form of securities fraud. Extending the protection of the securities laws to the victims of schemes so fraudulent that the underlying paper does not exist logically follows, as fraudsters would have a perverse incentive to magnify their deceptive conduct. Other courts have reached the same conclusion. *See [SEC v.] Lauer*, 52 F.3d [667, 670 (7th Cir.1995)] ("It would be a considerable paradox if the worse the securities fraud, the less applicable the securities laws."); *Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F.Supp. 531, 553 n. 10 (S.D.N.Y.1990) (fact that securities do not exist "does not remove an action from the operation of the federal securities laws.").

*Id.; see also SEC v. Gallard*, 1997 WL 767570 at *2–*3 (S.D.N.Y. Dec.10, 1997) (scheme involving non-existent "prime bank instruments" was actionable under federal securities laws).

Here, as in *Bremont*, that the Note is alleged to have existed nowhere but in the minds of the defendants does not remove this case from the purview of Rule 10b–5. A fraud in connection with the purchase or sale of a fraudulent security is no less actionable for its fictitious quality.[10]

CEPA and Gevers next argue that, even if it is sufficient for the purpose of stating a claim that the plaintiffs were led to believe that they were investing in securities, no claim is stated as to CEPA and Gevers because no act is alleged by which they induced the Trustees' initial decision in November 1993 to purchase the Note. CEPA contends that its "alleged statements were made *after* plaintiffs had handed their money to Pellegrin (an alleged "fraudster"), *and after* the seizure by DSB. Plaintiffs thus did not rely on CEPA's statements in making their investment and CEPA's statements did not cause either the transaction or plaintiffs' loss within the meaning of Section 10 or Rule 10b–5." CEPA Reply Mem. at 14 (emphasis in original). Similarly, Gevers argues that, since he "first became involved in this debacle *after* certain *other* defendants are alleged to have fraudulently induced plaintiffs to part with $9.3 million, ... it is impossible to fathom any basis for alleging that [he] 'caused' plaintiffs' loss." Gevers Mem. at 12 (emphasis in original).

However, the Trustees' initial decision to devote Fund assets to the purchase of the Note is not the sole relevant act for determining the scope of reliance in this case. Instead, it is consistent with the purpose of Rule 10b–5 to view reliance in light of the alleged *continuing* scheme to mislead the

---

**10.** *Cf. SEC v. Norton*, 1997 WL 611556 (S.D.N.Y. Oct.3, 1997). That case also involved a "prime bank instrument" fraud, but one in which the defendants did not represent that investor funds would be used to purchase the non-existent securities. Instead, the SEC alleged that investors were told that their funds were to be placed in an escrow account as a means of demonstrating to sellers of prime bank instruments that the defendants were financially sound. Distinguishing *Bremont*, the court held that this could not be characterized as a fraud undertaken "in connection with" the purchase or sale of securities.

Instead, since the only purported use of investor funds was to "facilitate" securities purchases, it was a mere "garden variety fraud" that was no different from a scheme in which the plaintiff has "been induced into [an] escrow transaction based on false allegations of a profitable real estate transaction that [the defendant] was about to enter." 1997 WL 611556 at *4. By contrast, *Bremont*, and this case, both involve alleged schemes in which it was purported that investor funds *would* be applied to the purchase of prime bank instruments.

plaintiffs. In *Perez–Rubio v. Wyckoff*, 718 F.Supp. 217 (S.D.N.Y.1989), the plaintiffs alleged that they had been defrauded by a complex scheme pursuant to which they had been induced to place funds in certain offshore corporations formed to shield the plaintiffs from U.S. taxes. Although the defendants represented that they would invest the funds placed with the corporations in legitimate securities, they actually used them to make loans to a brokerage firm, which maintained its seat on the New York Stock Exchange by listing the funds as part of its equity in order to satisfy the Exchange's firm capital requirements. The defendants concealed these loans by providing the plaintiffs with fictitious account statements that represented that their funds were being conservatively invested. Indeed, the defendants were able to maintain their deception for more than six years. The defendants, like CEPA and Gevers, asserted that statements made in connection with the cover-up could not have been relied upon in connection with the plaintiffs' initial investment decision and, therefore, could not have been the cause of any alleged loss suffered by them.

The court disagreed. Instead, it held that the defendants' concealment of their scheme to divert the plaintiffs' funds over the course of six years had the effect of impeding the plaintiffs from recalling those funds. And herein lay reliance and causation of loss:

> The Court can properly infer that if Ossorio had disclosed his scheme to use plaintiffs' funds for the benefit of himself and Drysdale, plaintiffs would never have permitted the securities transactions set forth above. Furthermore, plaintiffs have alleged that defendants were involved directly in the process by which the funds were diverted. The damage plaintiffs complain

of must be considered a foreseeable consequence of the alleged fraud.

718 F.Supp. at 239 (citations omitted).

The plaintiffs in this case contend that, if not for the alleged misrepresentations of the defendants, including those attributed to Gevers and CEPA, they would not have been possessed for well over a year of the false belief that their $9.3 million was in the process of being applied to the purchase of the Note. Consequently, but for their reliance upon these alleged misrepresentations, they would have recalled their investment. The Amended Complaint clearly alleges that the fraudulent activity undertaken by the defendants after the Trustees' initial decision to invest consisted of much more than a cover-up. On the contrary, the Amended Complaint details a series of misappropriations of the Funds' assets after they had been placed with CEPA, purportedly to purchase the Note. In accord with *Perez–Rubio*, therefore, I find that these contentions adequately set forth a claim of reliance.[11]

Contrary to the argument of CEPA and Gevers, *Mills v. Polar Molecular Corp.*, *supra*, in no way suggests that *Perez–Rubio* should be rejected. In *Mills*, the plaintiffs signed employment contracts with the defendants. These contracts provided that, as part of their compensation, the plaintiffs would receive unregistered shares of company stock that would be registered "at the earliest opportunity." 12 F.3d at 1173. Upon signing the contracts, the plaintiffs began to work for the defendants, but the shares were never registered. In seeking to sustain a Rule 10b–5 claim, one of the plaintiffs, Miles, alleged that a fraudulent promise to immediately register the shares had been made to him by one of the defendants 18

---

11. In a further extension of their argument, both CEPA and Gevers urge the Court to reject a finding of reliance as to any alleged misrepresentation made after the seizure of the Fund's assets by DSB. They contend that any such reliance could not have been the cause of any damage to the plaintiffs because there was no chance that the plaintiffs could have effected the return of the seized funds. In spite of their professed certainty on this point, neither CEPA nor Gevers make any demonstration of how the allegations of the Amended Complaint support, or even suggest, their conclusion that the Fund's effort to retrieve

its money was, at best, a quixotic undertaking. It is not contested that the Fund in fact made the effort to retrieve its assets from German banking authorities, ¶ 73, and, on the basis of CEPA and Gevers' purely conclusory assertions, I cannot conclude that this albeit unsuccessful effort was hopeless. Nor can I conclude that the chance of success would not have been increased had the plaintiffs discovered the alleged fraud earlier, which, they assert, would have been the case but for their reliance upon the defendants' continuing series of misrepresentations.

months after he had signed his employment contract. The court held that this statement could not be relied upon for the assertion of a securities fraud claim because "obviously, [it] could not have induced Miles to sign the contract." *Id.* at 1175. At the time the statement was made, Miles had been irrevocably defrauded of 18 months of his labor. This is clearly different from the situation here, where the plaintiffs have alleged that statements made over the course of many months after the initial decision to invest in the Note induced them to maintain that investment, on which the defendants purported to pay them interest, and prevented them from seeking to recover their assets.

In sum, the atypicality of the securities fraud set forth in the Amended Complaint is by no means a bar to the application of Rule 10b–5. On the contrary, more than three decades ago—long before fraud on the market cases and cases involving complex derivative securities became common in securities fraud litigation—our Court of Appeals plainly declared that "[n]ovel or atypical methods [of fraud] should not provide immunity from the securities laws." *A.T. Brod & Co. v. Perlow,* 375 F.2d 393, 397 (2d Cir.1967).

Further, while the fraud set forth in the Amended Complaint may be atypical now, it may not be viewed as such in the near future. As the court noted in *Bremont,* fraud involving purported transactions in so-called prime bank instruments "has become rife in recent years." 954 F.Supp. at 728. In consideration of this, the federal securities laws, as has happened in the past, should be applied to meet a challenge posed by the ingenuity of the practitioners of fraud. *See* D. Langevoort, *Rule 10b–5 as an Adaptive Organism,* 61 Fordham L.Rev. S7 (1993) (noting that the terms of Rule 10b–5 "are sufficiently indistinct that a cunning operator cannot confidently" escape its grasp through "new schemes and tactics"). I therefore hold that Count One of the Amended Complaint states a claim as to CEPA and Gevers.

### D. RICO Claim.

Counts Two and Three of the Amended Complaint assert claims for violations of RICO and for conspiracy to violate RICO.

CEPA and Gevers have moved, again pursuant to Rule 12(b)(6), to have these claims dismissed as to them. As will be seen, however, their attacks upon the RICO counts consist largely of arguments already rejected above in other contexts.

 The components of a proper claim under RICO are as follows:

1) that the defendant 2) through the commission of two or more acts 3) constituting a 'pattern' 4) of 'racketeering activity' 5) directly *or* indirectly invests in, or maintains an interest in, 6) an 'enterprise' 7) the activities of which affect interstate or foreign commerce.

*DeFalco v. Dirie,* 923 F.Supp. 473, 476 (S.D.N.Y.1996) (citing *Moss v. Morgan Stanley,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984)). Where, as here, allegations of fraud serve as the basis of a RICO claim, those allegations must meet the pleading requirements of Rule 9(b). *Pahmer v. Greenberg,* 926 F.Supp. 287, 300 (E.D.N.Y.1996), *aff'd.,* 123 F.3d 717 (2d Cir.1997). I have already determined that the Amended Complaint satisfies Rule 9(b).

 The Amended Complaint alleges that the H & P Defendants, the Infinity Defendants, Stovin–Bradford, D'Souza, Gevers and CEPA formed an enterprise within the meaning of 18 U.S.C. § 1961(4), ¶ 125, and that this enterprise engaged in a pattern of racketeering activity as defined 18 U.S.C. § 1961(5). ¶ 127. Further, the Amended Complaint alleges the existence of numerous predicate acts of fraud, including several committed by Gevers. CEPA and Gevers' primary attack upon the RICO claims is that this alleged conspiracy is too limited in scope and of too short a duration to satisfy the so-called "continuity" requirement of RICO. This requires that the plaintiff in a RICO action allege that the conspiratorial enterprise has engaged in either

an "open-ended" pattern of racketeering activity (*i.e.,* past criminal conduct coupled with a threat of future criminal conduct) or a "closed-ended" pattern of racketeering activity (*i.e.,* past criminal conduct extending over a substantial period of time).

*GICC Capital Corp. v. Technology Finance Grp.*, 67 F.3d 463, 466 (2d Cir.1995), *cert. denied*, 518 U.S. 1017, 116 S.Ct. 2547, 135 L.Ed.2d 1067 (1996).

CEPA argues that the Amended Complaint does not allege a closed-ended scheme because, in CEPA's characterization, it sets forth "a one-shot, short-lived scheme to convert a single sum of money from a single victim which was completed when that entity parted with the money." CEPA Mem. at 21. CEPA here invokes the principle that acts undertaken merely to cover up the original conspiracy cannot be used to establish continuity. *See, e.g., Barsam v. Pure Tech Intern., Inc.*, 864 F.Supp. 1440, 1450 (S.D.N.Y.1994).

This line of argument is very much a reprise of the contention that no Rule 10b–5 claim lies as to CEPA and Gevers because the scheme alleged in the Amended Complaint was over before they are alleged to have performed any acts upon which the plaintiffs could have relied to their detriment. Here as well, however, to argue that the scheme set forth in the Amended Complaint was over when the $8.3 million was placed with DSB is to mischaracterize the alleged scheme. In fact, the scheme consisted of an ongoing effort at misappropriation, which would have failed had the plaintiffs not been led to believe over the course of many months that the Fund's assets were being applied to a legitimate investment. During the same time that these misrepresentations induced the plaintiffs not to recall their investment, the Amended Complaint alleges that a series of illegitimate distributions were made to various defendants. These acts of misrepresentation and misappropriation were not isolated or sporadic. Put another way, the defendants' continuing misrepresentations allowed them to effect misappropriations of the Fund's assets and lulled the plaintiffs into not seeking a return of their money.

The many predicate acts alleged here were part of a complex scheme involving many participants. These acts took place over the course of more than two years, from the initial efforts by H & P in the Summer of 1993 to interest the Trustees in an investment in a "prime bank note" until the filing of the original complaint in September 1995. *See, e.g., Nafta v. Feniks Intern. House of Trade (U.S.A.)*, 932 F.Supp. 422, 426 (E.D.N.Y.1996) ("relevant time span" for determining the sufficiency of RICO continuity requirement "encompass[es] all of defendants' activities related to the fraudulent scheme alleged"). These allegations meet RICO's requirement that an enterprise has engaged in a "closed-ended" pattern of racketeering. *See, e.g., Brooke v. Schlesinger*, 898 F.Supp. 1076, 1086 (S.D.N.Y.1995) (allegations of scheme to loot single corporation taking place over seventeen months supported RICO claim); *D'Orange v. Feely*, 894 F.Supp. 159, 163 (S.D.N.Y.1995) (single embezzlement scheme taking place over two and one-half years supported RICO claim), *aff'd*, 101 F.3d 1393, 1996 WL 446254 (2d Cir.1996), *cert. denied*, —— U.S. ——, 118 S.Ct. 309, 139 L.Ed.2d 238 (1997). *Compare, e.g., GICC Capital Corp. v. Technology Finance Grp.*, 67 F.3d at 467–68 (alleged scheme lasting eleven months did not satisfy RICO continuity requirement); *Protter v. Nathan's Famous Systems, Inc.*, 904 F.Supp. 101, 110 (E.D.N.Y.1995) (scheme involving sale of franchises could not support RICO claim where alleged fraud lasted "a few months").[12]

CEPA and Gevers' second attack on the RICO counts asserts a failure to set forth the requisite degree of involvement on their part in the alleged enterprise. The parameters of the RICO participation requirement are set forth in *Reves v. Ernst & Young*, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). Under *Reves*, mere participation in a RICO enterprise, even if knowing, is not sufficient to impose RICO liability upon an individual alleged conspirator. 507 U.S. at 178. On the other hand, it is not necessary for the defendant to have

12. The plaintiffs also contend that open-ended continuity is satisfied here based upon the Amended Complaint's allegation that the defendants' illegal activity would have continued indefinitely "but for the institution of this action."

¶ 129. Having found that the Amended Complaint has satisfied the RICO continuity requirement by alleging sufficiently a closed-ended pattern of racketeering, the argument for open-ended continuity will not be addressed.

had "primary responsibility for the enterprise's affairs." *Id.* at 179. Instead, what is required is some evidence that an individual "has participated in the operation or management of the enterprise itself." 507 U.S. at 183. Our Circuit has specifically held that *Reves* demands a demonstration that a defendant is more than an aider or abettor of the enterprise's illegal actions before he is subjected to RICO liability. *U.S. v. Viola*, 35 F.3d 37, 41 (2d Cir.1994), *cert. denied*, 513 U.S. 1198, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995).

■■■ As to Gevers, there is no question that the Amended Complaint alleges sufficient involvement on his part to satisfy, this "operation or management" test. *Nafta v. Feniks Int. House of Trade (U.S.A.), supra,* is illustrative. *Nafta* involved a scheme to deplete the assets of a foreign corporation through a series of clandestine financial transactions. Relying upon *Reves*, certain defendants moved to dismiss RICO claims because they contended that they had merely served as holders of purloined funds. The court noted that, while "the simple taking of directions and performance of tasks that are necessary or helpful to the enterprise, without more, is insufficient" to qualify one as a participant in a RICO enterprise, 932 F.Supp. at 429 (citation omitted), the plaintiffs' allegations were not so limited:

> The facts of the complaint indicate that the defendants in question took an active role in the fraudulent scheme alleged, submitting false documents to the Secretary of State of New York and Chase Manhattan Bank, making misrepresentations to employees of Chase Manhattan regarding their authorization to act on behalf of Ventspils Nafta, and personally directing fraudulent transfers from the Ventspils Nafta account at Chase Manhattan. Far from being menial employees whose involvement in the alleged enterprise consisted of blindly following their superiors orders, defendants ... were active and significant participants in the "operation or management of the enterprise itself." *Reves,* [507 U.S.] at 184.

*Id.* Here, the Amended Complaint alleges that Gevers prepared and submitted, through D'Souza, a false document to DSB, ¶ 66, that he made misrepresentations that were forwarded to the plaintiffs, ¶¶ 78, 79, 82, and that he facilitated the transfer of the Fund's assets to D'Souza's account at DSB. ¶ 66. The allegations suggest that he was not a ministerial actor, but one who took an active role in "the operation or management" of the enterprise.

■■■ That CEPA is a non-U.S. corporation does not shield it from RICO liability. *North South Finance Corp. v. Al–Turki*, 100 F.3d 1046, 1051 (2d Cir.1996). CEPA repeats here the argument that it made in opposition to the exercise of personal jurisdiction, namely, that the Amended Complaint alleges only acts by Gevers and that no wrongdoing on the part of CEPA is alleged. On these allegations, CEPA argues that it can only be held liable pursuant to respondeat superior, which, they assert, is not available under RICO. *See Bogart v. Shearson Lehman Bros., Inc.*, 1993 WL 33643 at *9 (S.D.N.Y. Feb.3, 1993) (collecting cases).[13] The plaintiffs correctly respond that RICO liability may be imputed to a corporation where an agent acts on behalf of a corporate entity with that entity's knowledge. *See Burke v. Dowling*, 944 F.Supp. 1036, 1069–70 (E.D.N.Y.1995) (allegation of corporate benefit and inference of corporate knowledge sufficient to support RICO claim against corporation); *Jerry Kubecka, Inc. v. Avellino*, 898 F.Supp. 963, 970 (E.D.N.Y.1995) ("Where an agent ... takes part in the direction of the enterprise on behalf of the corporations, those corporations may be said to have had some part in its direction").

As recently stated by a district court outside of our Circuit, "(w)hatever name is given to the theory of liability, the critical question is whether the illegal conduct alleged was known to and participated in by sufficiently high-level employees within a corporation and/or was sufficiently pervasive within the corporation as to be fairly attributable to the corporation." *In re American Honda Motor Co., Inc. Dealerships*, 958 F.Supp. 1045, 1051

---

13. The Court of Appeals for the Second Circuit has yet to decide this question. *See In re Ivan F.*

*Boesky Securities Litig.*, 36 F.3d 255, 262 (2d Cir.1994).

n. 3 (D.Md.1997). The plaintiffs here allege that Gevers, a managing director of CEPA, was pervasively involved in the fraudulent enterprise set forth in the Amended Complaint. They also allege that he acted with the knowledge, and for the benefit, of CEPA, allegations that must be taken as true on this motion. Thus, more than mere respondeat superior liability is alleged here.

In sum, the plaintiffs have properly stated a claim under RICO as to Gevers and CEPA. I therefore deny their motions to dismiss Count Two. I also deny their motion to dismiss Count Three. The sufficiency of allegations of a conspiracy to violate RICO are measured under the permissive pleading standard of Federal Rule of Civil Procedure 8(a). *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d at 26 n. 4. Since the Amended Complaint contains more than bare and conclusory allegations of the existence of a conspiracy to defraud the plaintiffs, it is sufficient to meet this standard. *Colony at Holbrook, Inc. v. Strata G.C., Inc.,* 928 F.Supp. 1224, 1238 (E.D.N.Y.1996).

**E. ERISA Claim.**

In Count Four of the Amended Complaint, the plaintiffs allege that CEPA and Gevers violated ERISA Section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), ¶ 147, which imposes liability upon pension plan fiduciaries who engage in improper transactions involving plan assets. ¶ 147. Accordingly, the plaintiffs also allege that CEPA and Gevers were fiduciaries of the Fund within the meaning of ERISA. ¶ 145.

■ ERISA defines "fiduciary" as follows:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). Fiduciary status is a question for the court, *Trustees of the Health and Welfare and the Pension Funds of the Four Joint Boards v. Schlesinger Bros., Inc.,* 931 F.Supp. 204, 207 (S.D.N.Y.1996), and the inquiry is guided by the principle that Congress intended the statutory definition to be broadly construed. *Lopresti v. Terwilliger,* 126 F.3d 34, 40 (2d Cir.1997). However, even given broad construction, the allegations of the Amended Complaint set forth no acts that warrant conferring fiduciary status upon CEPA and Gevers.

■ The plaintiffs assert that CEPA and Gevers were fiduciaries because they controlled the disposition of Fund assets when they effected the various transfers of the $9.3 million in the Bank Gonet account. ¶ 145. However, these acts, standing alone, do not confer fiduciary status. In *Geller v. County Line Auto Sales, Inc.,* 86 F.3d 18 (2d Cir. 1996), the Court of Appeals was faced with the question whether defendants who siphoned off more than one hundred thousand dollars in pension plan assets thereby became fiduciaries under ERISA. The defendants were employers who participated in a multi-employer pension plan for their employees. They falsely claimed that the girlfriend of one of them was their employee in order to obtain medical benefits for her. Although it was uncontested that, as employers, the defendants performed a number of ministerial, non-fiduciary, functions with respect to the pension plan, the court held that their fraudulent acts, even though they dissipated plan assets, did not confer fiduciary status upon them because they did not thereby "exercise the *requisite degree* of control and discretion to be held liable [as fiduciaries]." 86 F.3d at 21 (emphasis added); *see also Southern Council of Industrial Workers v. Ford,* 83 F.3d 966, 968–69 (8th Cir.1996) (non-fiduciary does not become fiduciary merely because it possesses cash to which a pension fund lays claim); *Pappas v. Buck Consultants, Inc.,* 923 F.2d 531, 538 (7th Cir.1991) (professional consultant does not become fiduciary by virtue of allegation that it acted negligently with respect to pension

fund assets when performing professional services); *Nieto v. Ecker,* 845 F.2d 868, 870–71 (9th Cir.1988) (attorney who failed to perform ministerial function of collecting employer contributions to pension plan was not plan fiduciary).

The principle that a determination of fiduciary status under ERISA is dependent upon all exercise of the "requisite degree" of control over plan assets is well illustrated in the very recent decision in *Lopresti v. Terwilliger, supra.* In that case, the plaintiffs had a collective bargaining agreement with their employer pursuant to which the employer was to deduct plan contributions from employee wages and place them in an account separate from the company's general account. The plaintiffs alleged that, when the company fell upon hard times, funds from the plan contribution account were commingled with the company's general account and used to pay off the company's creditors. The company was wholly owned by two brothers, John and Donald, who both had formal authority to sign checks upon the company's general account. However, in practice, it was Donald who actually ran the company's financial affairs while John, even though "he had some general knowledge that deductions were made from employees' wages, . . . was 'primarily' a 'production' person with 'no responsibility for determining which of the company's creditors would be paid or in what order.'" 126 F.3d at 40. Upon the distinction between the relative degree of control over plan contributions exercised by the two brothers, the court found that Donald was an ERISA fiduciary while John was not. *Id.* at 40–41.

CEPA and Gevers are not ERISA fiduciaries. First, in contrast to the Terwilliger brothers, they had no contractual agreement with the Fund regarding the disposition of Fund assets. In addition, the Amended Complaint does not allege that they had any role in the Trustees' decision to purchase the Note and does not allege that they were either granted fiduciary authority over the assets used to make the purchase or that they purported to in any way act as fiduciaries. That they are alleged to have fraudulently misappropriated Fund assets meant

for the purchase of the Note does not in itself transform them into fiduciaries.

To the extent that *Lopresti* and *Geller* may be read as being inconsistent with the Court of Appeals' earlier decision in *Blatt v. Marshall and Lassman,* 812 F.2d 810 (2d Cir. 1987), upon which the plaintiffs rely, it is the later opinions that must be followed. *National American Corp. v. Federal Republic of Nigeria,* 448 F.Supp. 622, 636 n. 24 (S.D.N.Y.1978), *aff'd.,* 597 F.2d 314 (2d Cir. 1979). In *Blatt,* a former employee of the defendants' company sought to withdraw his accrued pension assets. However, the defendants prevented his receipt of these assets by refusing to perform the purely ministerial function of signing a form confirming his employment status. The Court of Appeals held that, because the defendants, by refusing to sign the form, "exercised actual control respecting the disposition of plan assets," they conferred fiduciary status upon themselves. 812 F.2d at 813. *Blatt* therefore appears to employ a broader notion of who may qualify as an ERISA fiduciary. However, in accord with *Geller* and *Lopresti,* I conclude that CEPA and Gevers cannot be deemed fiduciaries under ERISA and therefore dismiss Count Four as to them.

### III. CEPA AND GEVERS' MOTIONS TO DISMISS THE COMMON LAW CLAIMS

**A. Preemption.**

▮ As a threshold matter, CEPA and Gevers argue that, regardless of whether or not the plaintiffs' ERISA claim is dismissed, the plaintiffs may not proceed with their common law claims because these are preempted by ERISA. This argument is incorrect.

ERISA contains a preemption provision that is "among the broadest that can be found in the law," *Geller v. County Line Auto Sales, Inc.,* 86 F.3d at 22, and which provides that ERISA "shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan [subject to ERISA]." 29 U.S.C. § 1144(a). This provision has been interpreted to preempt not only claims asserted under state

statutes that explicitly reference pension plans, but also common law claims that seek to enforce rights under a pension plan where ERISA provides a means of enforcing such rights. Thus, in *Smith v. Dunham–Bush, Inc.*, 959 F.2d 6 (2d Cir.1992), common law claims for breach of contract and negligent misrepresentation brought to enforce an alleged oral promise to pay pension benefits were held to be preempted by ERISA, even though the plaintiff clearly could not succeed under ERISA because oral promises are unenforceable under the statute. Unfortunately for the plaintiff, "(t)he effect of ERISA preemption is wholly to eliminate state law claims by benefit plan participants and beneficiaries, leaving them only the causes of action provided in the statute's civil enforcement provisions." 959 F.2d at 11.

But despite the breadth of ERISA's preemption provision, the common law claims asserted here are not barred. As has been determined above, CEPA and Gevers are not ERISA fiduciaries and, therefore, the plaintiffs cannot seek recovery under ERISA for CEPA and Gevers' alleged failure to fulfill their fiduciary duties under the statute. Further, CEPA and Gevers do not suggest any other provision of the statute pursuant to which the plaintiffs could proceed against them. CEPA and Gevers have therefore not demonstrated that the plaintiffs' common law claims are "nothing more than an alternative theory of recovery for conduct actionable under ERISA," *Lopresti v. Terwilliger*, 126 F.3d at 41, and, allowing the plaintiffs to proceed with their common law claims will not encroach upon the regulatory scheme established by ERISA. *See Pedre Co., Inc. v. Robins*, 901 F.Supp. 660, 665–66 (S.D.N.Y. 1995) (plaintiffs could proceed with common law claims if discovery determined that defendants were not ERISA fiduciaries); *Cook Wholesale of Medina, Inc. v. Conn. Gen. Life Ins. Co.*, 898 F.Supp. 151, 153–56 (W.D.N.Y. 1995) (denying dismissal of common law claims brought against non-fiduciary insurer of ERISA plan).

**B. Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty.**

■ Count Five of the Amended Complaint asserts a claim for breach of fiduciary duty and for aiding and abetting a breach of fiduciary duty. As with their claim under ERISA, the plaintiffs have not pled facts supporting the existence of a fiduciary relation between themselves and CEPA and Gevers. They attempt to do so by arguing that a broker-client relation existed in that CEPA and Gevers held investment funds on behalf of the Trustees. However, a broker-client relation is established by contract, *see* 11 N.Y.Jur.2d, *Brokers*, § 5 at 431 (1996), and the Amended Complaint does not sufficiently allege the existence of a contract between the Fund and CEPA or Gevers. *See infra*, p. 572.

■ On the other hand, having alleged that defendants other than CEPA and Gevers did have a fiduciary relationship with the Trustees, and given the allegations as to CEPA and Gevers' participation in the scheme, the plaintiffs have stated a claim against them for aiding and abetting a breach of fiduciary duty. *See, e.g., Shearson Lehman Bros., Inc. v. Bagley*, 205 A.D.2d 467, 614 N.Y.S.2d 5 (1st Dep't 1994). The motions to dismiss Count Five are therefore denied.

**C. Fraud and Fraudulent Conspiracy.**

■ Count Six of the Amended Complaint asserts a claim for fraud and fraudulent conspiracy. Having found that the plaintiffs have stated a Rule 10b–5 claim against CEPA and Gevers, there is no doubt that their motions to dismiss Count Six should be denied because a common law fraud claim analogously requires a showing of misrepresentation, reliance and injury. *See, e.g., Rosen v. Spanierman*, 894 F.2d 28, 34 (2d Cir.1990). Further, while New York does not recognize a claim for fraudulent conspiracy alone, 20 N.Y.Jur.2d, *Conspiracy–Civil Aspects*, § 13 at 18 (1982 & 1997 Supp.), allegations of conspiracy are permitted "to connect the actions of separate defendants with an otherwise actionable tort." *Alexander & Alexander of New York, Inc. v. Fritzen*, 68 N.Y.2d 968, 969, 510 N.Y.S.2d 546, 503 N.E.2d 102 (1986). Here, the underlying fraud alleged against the defendants

is the actionable tort that serves to support Count Six's claim of fraudulent conspiracy. The motions to dismiss Count Six are therefore denied.

### D. Conversion and Aiding and Abetting Conversion; Money Had and Received and Aiding and Abetting Money Had and Received.

■ Counts Seven and Eight of the Amended Complaint assert, respectively, claims of conversion and of money had and received. Both claims require the pleading of unauthorized appropriation of the plaintiffs' funds by the defendants for the defendants' benefit. *See Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank,* 731 F.2d 112, 125 (2d Cir.1984) (money had and received); *City of Amsterdam v. Daniel Goldreyer, Ltd.,* 882 F.Supp. 1273, 1280 (E.D.N.Y.1995) (conversion). These claims are based upon the Amended Complaint's detailed allegations that CEPA and Gevers participated in the misappropriation of the Fund's $9.8 million. Since the elements of each are alleged, the motions to dismiss Counts Seven and Eight are denied.

### E. Negligence.

■ Count Nine asserts a claim of negligence. To state a *prima facie* case of negligence, a plaintiff must establish that 1) the defendant owed the plaintiff a cognizable duty of care; 2) that this duty was breached; and 3) that the plaintiff suffered injury as a proximate cause of that breach. *Solomon v. City of New York,* 66 N.Y.2d 1026, 1027, 499 N.Y.S.2d 392, 489 N.E.2d 1294 (1985).

■ CEPA and Gevers argue that Count Nine should be dismissed as to them because the plaintiffs cannot establish that they owed any cognizable duty to the plaintiffs. The Amended Complaint contains allegations that CEPA and Gevers may have assumed a duty to act with reasonable care with respect to the application of the Fund's assets to the purchase of the Note. *See Kimmell v. Schaefer,* 89 N.Y.2d 257, 263, 652 N.Y.S.2d 715, 675 N.E.2d 450 (1996) (liability may be imposed upon persons with special expertise upon whom injured party may justifiably rely).

Thus, the motions to dismiss Count Nine are denied.

### F. Breach of Contract.

■ Count Ten of the Amended Complaint asserts a claim for breach of contract, which claim requires, *inter alia,* "plead[ing] the terms of the agreement upon which defendant's liability rests." *Posner v. Minn. Mining & Mfg. Co., Inc.,* 713 F.Supp. 562, 563 (E.D.N.Y.1989). The Amended Complaint does not do this, but merely declares that "(t)o the extent" that the representations of the defendants to the Trustees "constituted a contractual commitment," such contract was breached. ¶ 194. Accordingly, CEPA and Gevers' motions to dismiss Count Ten are granted.

### G. Accounting.

■ Count Eleven of the Amended Complaint, which asserts a claim for an accounting, will be dismissed as to CEPA and Gevers. An action for an accounting under New York law, as with the ERISA claim discussed above, requires a showing that the plaintiff had a fiduciary or confidential relationship with the defendant. *Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.,* 87 F.3d 44, 49 (2d Cir.1996). But, as with the ERISA claim, the Amended Complaint does not set forth sufficient allegations of such a relationship.

### IV. CEPA AND GEVERS' MOTIONS TO DISMISS CROSS—CLAIMS

The motions of CEPA and Gevers to dismiss cross-claims brought against them by the H & P defendants rest solely upon the assertion that the dismissal of these cross-claims should follow from the granting of their motions to dismiss them from this action. Since this contingency has not occurred, the motions to dismiss the cross-claims are denied.

### V. STOVIN–BRADFORD'S MOTION TO DISMISS

The Amended Complaint contains allegations of Stovin–Bradford's involvement in the scheme to defraud the Fund that are at least

as well pled as those directed at CEPA and Gevers. Stovin–Bradford's motion to dismiss the Amended Complaint pursuant to Rules 9(b) and 12(b)(6) consists of nothing but a declaration of adoption of the arguments made by CEPA and Gevers. Accordingly, to the extent that CEPA and Gevers' motions to dismiss on the merits have been denied, Stovin–Bradford's is denied as well.

## VI. ALTMAN'S MOTION TO DISMISS

█ Altman and his law firm, Altman and Associates, P.C., move pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss Count Twelve of the Amended Complaint, which asserts a claim of attorney malpractice as to them. Such a claim requires the allegation of "(i) the existence of an attorney-client relationship, (ii) that the attorney was negligent, (iii) that the negligence was the proximate cause of the injury sustained, and (iv) actual damages." *Smith v. City of New York*, 950 F.Supp. 55, 59 (E.D.N.Y.1996). Altman and his law firm make two arguments in support of dismissal; neither is meritorious.

█ First, in a variation on the theme composed by CEPA and Gevers, Altman argues that he and his firm came on the scene too late to have performed any actionable act or omission with respect to their work for the plaintiffs, that is, since the Altman firm only became counsel to the Fund on December 14, 1993, ¶ 37, after the Trustees had decided to invest in the Note, the plaintiffs cannot claim that they relied upon any act or omission of Altman's or his firm's in making that decision. This ignores that the gravamen of the plaintiffs' claim against Altman and his firm, who were hired expressly because the fund's prior counsel had a conflict of interest with respect to the investment in the Note, ¶ 37, is that they failed to properly monitor the investment of the $9.3 million for more than a year after the initial decision to invest in the Note had been made by, *inter alia*, ignoring the SEC bulletin regarding prime note bank fraud forwarded to the Trustees by Prudential Securities. ¶ 203. Alleging a failure to fulfill a duty of monitoring can state a claim for attorney malpractice. *See, e.g., Lama Holding Co. v. Shearman & Sterling*, 758 F.Supp. 159, 161 (S.D.N.Y.1991) (where law firm was retained to establish off-shore corporations, complaint sufficiently alleged malpractice claim based upon allegations of firm's continuing duty to inform client of tax law changes relevant to corporate operations); *Quintel Corp. v. Citibank, N.A.*, 606 F.Supp. 898, 911–12 (S.D.N.Y.1985) (jury could find that attorney retained after client decided to enter into limited partnership agreement "undertook a duty to thoroughly investigate all matters affecting [client's] rights" in connection with limited partnership).

█ Second, Altman urges that I exercise the discretion afforded me pursuant to 28 U.S.C. § 1367 to decline to exercise supplemental subject matter jurisdiction as to him and his firm in that they are the only defendants in this action as to whom a federal claim has not been asserted. However, under Section 1367(a), subject matter jurisdiction may properly be asserted over *all* claims that are "part of the same case or controversy" as the claims that form the basis of federal subject matter jurisdiction. *See, e.g., Jerry Kubecka, Inc. v. Avellino*, 898 F.Supp. at 972.

█ Altman does not argue that the claims against him are not sufficiently related to those that form the basis of the federal claims. Rather, he argues that, pursuant to Section 1367(c)(4), I may decline subject matter jurisdiction upon a showing of "exceptional circumstances." Altman's only assertion of exceptional circumstances, however, is the supposed prejudice that will result from teaming him—a purported "poor schnook"—with "international conspirators." Altman Mem. at 8–9. On the facts alleged, this speculative claim of prejudice does not constitute an exceptional circumstance. The motion of Altman and his firm to dismiss Count Twelve is accordingly denied.

## CONCLUSION

1. The motions of CEPA and Gevers for dismissal for lack of personal jurisdiction are DENIED;

2. The motion of Stovin–Bradford for dismissal for lack of personal jurisdiction is

DENIED, and the Report and Recommendation of Magistrate Judge Orenstein, dated September 19, 1997, is adopted;

3. The motion of D'Souza for dismissal for lack of personal jurisdiction is GRANTED. D'Souza's motion to dismiss pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) is therefore moot;

4. The motions of CEPA, Gevers and Stovin–Bradford to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 9(b) are DENIED;

5. The motions of CEPA, Gevers and Stovin–Bradford to dismiss Counts One, Two, Three, Five, Six, Seven, Eight and Nine of the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) are DENIED;

6. The motions of CEPA, Gevers and Stovin–Bradford to dismiss Counts Four, Ten and Eleven of the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) are GRANTED;

7. The motions of CEPA and Gevers to dismiss the cross-claims asserted against them by Pollack, Horowitz and H & P are DENIED; and

8. The motion of Altman and Altman and Associates, P.C. for dismissal of Count Twelve of the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) is DENIED.

**SO ORDERED.**